PHILIP STARK, PLAINTIFF-APPELLANT-RESPONDENT, v. IRVING REINGOLD, DEFENDANT-RESPONDENT-APPELLANT.

PHILIP STARK, PLAINTIFF-APPELLANT-RESPONDENT, v. IRVING REINGOLD AND SALLY REINGOLD, HIS WIFE, DEFENDANTS-RESPONDENTS-APPELLANTS.

PHILIP STARK, *ET AL.*, PLAINTIFFS-APPELLANTS-RESPONDENTS, v. PARAMOUNT-HUDSON, INC., A NEW JERSEY CORPORATION, *ET AL.*, DEFENDANTS-RESPONDENTS-APPELLANTS.

Argued March 7 and 14, 1955—Decided April 25, 1955.

*Mr. Edward R. McGlynn* argued the cause for the plaintiffs-appellants-respondents (*Messrs. Joseph Weintraub* and *Albert S. Gross,* of counsel; *Mr. David A. Gelber,* attorney).

*Mr. John Milton, Jr.* argued the cause for the defendants as respondents and cross-appellants (*Messrs. Milton, McNulty & Augelli,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The plaintiffs have appealed and the defendants have cross-appealed from a final judgment entered in the Chancery Division. We certified on our own motion under *R. R.* 1:10–1(*a*).

In 1949 Philip Stark and his brother Max Stark were interested in Paramount Motors, Inc., a Hudson car dealer at 187 Passaic Street, Hackensack, and Irving Reingold and his wife Sally Reingold were the owners of premises located at 175 Essex Street, Hackensack, where a gas station, a U-Drive business and a Kaiser-Frazer dealership were operated by Irving Reingold. After some negotiations Philip Stark and Irving Reingold decided to join forces and enter into partnership and related ventures. Philip Stark states that there was an oral understanding that his brother Max would be recognized "as a 25% partner" when certain difficulties he was having with the New York law enforcement authorities (see *Stark v. Livermore,* 3 *N. J. Super.* 94 (*App. Div.* 1949), certification denied 3 *N. J.* 365 (1949)) were over; this is denied by Irving Reingold and the partnership agreements contain no provision indicating that Max Stark would ever be a partner. Four agreements were executed on April 27, 1949 and were to the following effect:

(1) Philip Stark as one party and Irving and Sally Reingold as the other, agreed to form a corporation to be known as "Paramount-Hudson, Inc." for the purposes of selling cars, operating gasoline service stations, and engaging in such other businesses as the board of directors determined from time to time. Philip Stark was to acquire equipment from Paramount-Motors, Inc. and transfer it to the new corporation and the Reingolds were to transfer the Essex Street property to the new corporation. Philip Stark was to purchase a half interest in certain assets being transferred by Irving Reingold to the partnerships being formed under other agreements

and was to pay for them by notes executed by Philip Stark and endorsed by Max Stark. The directors of the corporation were to be Philip Stark and his nominee and the Reingolds, and the officers were to be Irving Reingold, president, Sally Reingold, vice-president, Philip Stark, secretary and treasurer and Irving Levitt (Philip Stark's nominee) assistant secretary and treasurer. Irving Reingold and Philip Stark were to be employed "as co-managers" and were to devote their "entire time and efforts to the affairs of the corporation, except as to their joint management of any partnership interest existing between them." Philip Stark was "to cause the discontinuance of all business of Paramount Motors, Inc. in the exercise of its present Hudson Motor cars franchise" and Irving Reingold was "to discontinue the operation of the present business or businesses now operated by him on the premises described except as to the intended partnerships with Stark."

(2) An agreement between the Reingolds and Philip Stark provided that the Reingolds would not sell their stock in Paramount-Hudson, Inc. without first offering it to Philip Stark at book value and that Philip Stark would not sell his stock without first offering it to the Reingolds at book value. The same agreement indicated that 25 shares each would be issued to Irving and Sally Reingold and that 49 shares would be issued to Philip Stark and one share to his nominee Irving Levitt.

(3) An agreement between Irving Reingold and Philip Stark set forth that they thereby formed a partnership under the name of "Bergen County U-Driv-it Hertz Lic." to conduct the general business of renting automobiles "commonly called in the trade a U-Drive System." Paragraph seven of the agreement provided that neither party would (without the consent of the other) "assign, mortgage or sell his share in the partnership, or in its capital assets, or property, or enter into any agreement as a result of which any person shall become interested with him in the partnership, or to do any act detrimental to the best interests of the partnership or which would make it impossible to carry on the ordinary busi-

ness of the partnership." Paragraph ten provided that either partner could retire on three months' notice, in which event the other partner could purchase his interest for book value in accordance with the terms of the agreement.

(4) An agreement between Irving Reingold and Philip Stark set forth that they thereby formed a partnership under the name of "Rein Motors" to conduct the general business of "the maintenance and operation of a gasoline service station, including the purchase and sale of automobiles." This agreement contained provisions similar to those embodied in the agreement which formed the partnership under the name of "Bergen County U-Driv-it Hertz Lic."

After the four agreements were executed the parties proceeded to carry out their terms. The "Bergen County U-Driv-it Hertz Lic." partnership began operations at the Essex Street property and later changed its name to "Bergen County U-Driv-It"; it is still being operated profitably at the same premises now owned by Paramount-Hudson, Inc. Rein Motors acquired real property on Route 17 in Paramus and erected a large gas station thereon; this station, along with a gas station located at the Essex Street property, are still being operated profitably by Rein Motors; in addition, real property located in Hasbrouck Heights was purchased and is now owned by Rein Motors. Paramount-Hudson, Inc. is no longer engaged in the sale of cars but is operating profitably as a real estate holding corporation. Under date of December 14, 1949 the Reingolds entered into a written agreement with Philip Stark and Max Stark which authorized Philip Stark to transfer 25 shares of his stock in Paramount-Hudson, Inc. to Max Stark; this transfer was duly made and Max Stark is now the holder of 25 shares of stock in the corporation. Irving Reingold states that after he and Philip had formed the corporation and the partnerships Max Stark wanted to join them and that although he "did not want to have any part of it" he ultimately agreed to allow Philip to transfer half of his shares to his brother. Max was employed by the corporation as a salesman for "six or seven weeks."

Although the corporation and the partnerships operated harmoniously for a while, this situation was short-lived. Reingold testified that the partners "had a lot of troubles" and that they were all caused by the persistent efforts of Max to join them. He testified further that he has no grievances against Philip but that he would not be satisfied "to continue in partnership with him on the basis outlined in the partnership agreements of April 27, 1949." He pointed out that Philip had started legal proceedings seeking dissolution and that he intended to try to finish them. Philip testified that since early in 1951 he and Reingold "disagreed on everything"; that Reingold was "bullheaded" and did "everything on his own"; and that he was "getting ulcers" being a partner of Reingold's.

In September 1952 Philip filed his complaint in the Chancery Division seeking dissolution of Bergen County U-Driv-It and Rein Motors for alleged misconduct by Reingold; a counterclaim by Reingold sought, *inter alia,* a declaration that the filing of the complaint constituted a notice of retirement which entitled Reingold to purchase the plaintiff's interest in accordance with the terms of the partnership agreements. In the course of the proceeding it was disclosed that on June 9, 1952 Philip Stark and Max Stark had entered into an agreement which provided substantially as follows: whereas Max had advanced moneys to Philip over a period of six years and the parties desired to set down "their joint financial interests and/or obligations," (a) Philip declares that he holds a half interest in Rein Motors and Bergen County U-Driv-It for the benefit of Max and himself; (b) the parties agree that the earnings of the partnership, as to the one-half share in the name of Philip, shall be divided between them as therein stipulated; (c) Philip "will not complete any extraordinary business transaction in the ordinary course of the conduct of the said partnership businesses without first consulting" Max; and (d) Max grants an option to Philip to purchase Max' interests in Paramount-Hudson, Inc. and the partnerships for the sum of $115,000. This agreement of June 9, 1952 had apparently

been cancelled within a few months after its execution; Philip testified that it was never used and that when his attorney told him that it would harm him in his partnership agreements it was torn up by the parties. It does not appear to have caused any actual prejudice but after its execution came to light Reingold amended his pleading to assert that its execution was in breach of the partnership agreements and furnished grounds for dissolution under R. S. 42:1–38(2).

The Chancery Division entered judgment against the plaintiff on his complaint seeking dissolution but in favor of the defendant on his counterclaim to the extent that it sought dissolution under R. S. 42:1–38(2). It found that the plaintiff Philip Stark had not established any of his charges against Reingold but that, on the contrary, Philip had, by his agreement with Max dated June 9, 1952, "been guilty of conduct prejudicial to the partnership business" and "wilfully committed a breach of the partnership agreements." See R. S. 42:1–32, subd. 1(c), (d). Its judgment directed that Irving Reingold was entitled to continue the partnership business and possess its property provided he paid "the fair market value, without consideration of good will, of Philip Stark's interest in the partnership"; and it fixed valuations which seem to be considerably less than the value of the partnerships as a going business; thus, e. g., the judgment provides that "the present fair market value of the land, buildings, equipment and improvements of the Paramus station is the sum of $97,025.24"; this may be contrasted with a bona fide offer of $200,000 made on August 20, 1952 by an outside party. If Philip Stark was the sole guilty party then the result might, perhaps, be considered equitable and within the terms of the Uniform Partnership Law (R. S. 42:1–1 et seq.). Cf. Zeibak v. Nasser, 12 Cal. 2d 1, 82 P. 2d 375 (1938). If, however, Reingold was solely or equally guilty, then the result was grossly inequitable and clearly not within the Uniform Partnership Law. In this connection it becomes necessary that we review, at least briefly, the more significant charges which were leveled by Stark against Reingold and the evidence bearing thereon.

Stark testified that Reingold assumed domination of the partnership affairs and, without consulting him, made major policy determinations including reductions of gasoline prices and the discharge of a key employee. Although Reingold denied this he did testify that he considered himself the more capable man and that Stark was satisfied to take a back seat so long as the partnership was making money. Stark testified that on one occasion Reingold called the local police to evict Max Stark from the Essex Street property but they declined to do so and that on another occasion Reingold sought the intervention of Willie Moretti, a notorious gangster and racketeer. Stark testified that he asked Reingold "What was the idea of going to Moretti" and that Reingold replied, "Well there is one way of buying you out. You better take the $100,000 or else you will find out." Reingold admitted that he went to see Moretti on two occasions; he stated that his purpose was simply to have Moretti ask Max Stark not to come to the partnership place of business. An attorney who accompanied Reingold on the visits to Moretti testified that when he heard later that violence had allegedly been threatened by Moretti he called Max Stark to assure him that as far as he was concerned there had been "no irregularity."

In 1951 Max Stark and William Bray applied to Hertz U-Driv-It for a franchise for Jersey City and Fort Lee. After Hertz made inquiries of Reingold the application was refused. Thereafter Reingold sought the Jersey City franchise and it was issued to Hudson County Driv-Ur-Self, a New Jersey corporation in which a majority of the stock is in the name of Sally Reingold. Philip Stark testified that when he first heard about the issuance of the Jersey City franchise he spoke to Reingold who told him "he had nothing to do with it." In 1952 a Hertz franchise for Elizabeth was issued to Union County U-Driv-It, a corporation in which all of the stock is held by Sally Reingold and her nominees. During the trial there was extensive testimony by Reingold and his wife Sally which was designed to convey the impression that the Jersey City and Elizabeth franchises were

obtained entirely by Sally and that her husband had no interest whatever in those operations. The Chancery Division found that all of the money came from Reingold and that he "supervised the organization of the corporations and was instrumental in obtaining for them the Hertz franchise." Much of the testimony of the Reingolds was evasive and misleading. At one point during Sally's testimony the court felt obliged to interrogate her as to her husband's participation in the conduct of the Jersey City and Elizabeth businesses and, after obtaining her answers, to comment: "Why didn't you testify to that before, instead of studiously giving me the impression that your husband had nothing whatever to do with it?" At a point during Reingold's testimony he flatly denied recollection but shortly thereafter admitted having talked to the Chicago office of Hertz which caused the court to inquire pointedly as to the cause of the sudden change. No useful purpose would be served by detailing here the actual testimony of the Reingolds; our examination thereof has convinced us beyond question that Reingold is the beneficial owner of the controlling interests in the Jersey City and Elizabeth operations and that he has devoted at least some of his energies to their organization and success. The Chancery Division made no finding to the contrary but did conclude that they were not "in competition with the partnership" and that their operations had not "affected the partnership income adversely."

The Bergen U-Driv-It partnership business was not confined to Hackensack or Bergen County. It advertised extensively in northern New Jersey and in the New York telephone book and had customers in Hudson and Union Counties. One of its employees testified that it would accept customers from anywhere within or without New Jersey and that all Hertz U-Driv-It operations were in competition with each other. Apart from the question of whether the Jersey City and Elizabeth franchises affirmatively harmed the Hackensack operation, they represented valuable business opportunities which Reingold learned about as the result of his business relations with Hertz and which he diverted to

his own use to the exclusion of Philip Stark, his partner in the Hertz Hackensack operation. It seems to us that his partnership with Philip Stark imposed upon Reingold a fiduciary duty to share such business opportunities which clearly related to the subject of their partnership business. In *Bowne v. Windsor*, 106 *N. J. Eq.* 415, 416 *(Ch.* 1930), affirmed 108 *N. J. Eq.* 274 *(E. & A.* 1931), Vice-Chancellor Backes rightly pointed out that the relationship of co-partners was "one of trust and confidence, calling for the utmost good faith, permitting of no secret advantages or benefits." See *Wiley v. Wirbelauer*, 116 *N. J. Eq.* 391, 392 *(Ch.* 1934); *Neustadter v. United Exposition Service Co.*, 14 *N. J. Super.* 484, 493 *(Ch. Div.* 1951); *Crane, Partnership* (1952), 361, 363; 1 *Rowley, Partnership* (1916), 392, 394. *Cf.* the oft-quoted comment by Chief Judge Cardozo in *Meinhard v. Salmon*, 249 *N. Y.* 458, 164 *N. E.* 545, 62 *A. L. R.* 1 (1928):

"Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *Wendt v. Fischer*, 243 *N. Y.* 439, 444, 154 *N. E.* 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

In *Fouchek v. Janicek*, 190 *Or.* 251, 225 *P. 2d* 783 (1950), the Oregon Supreme Court recently restated the now generally accepted doctrine that where a member of a partnership obtains valuable information which may be used for the partnership's benefit he is not at liberty to conceal it and use it for his private benefit. When Reingold discovered that he could have the Jersey City franchise he should, in all good conscience, have discussed the matter frankly with his partner—they might well have agreed that the partner-

ship's interests required that it obtain the franchise. Instead, he privately arranged to have the Jersey City franchise (and later the Elizabeth franchise) issued to corporations which excluded his partner. This conduct not only deprived the partnership of the opportunity of profitably operating the new ventures, but actively aided in establishing independent U-Driv-It places of business which, at least to some extent, would attract business which might otherwise go to the partnership. We are not prepared to accept the suggestion that Reingold set up the Jersey City and Elizabeth operations without diverting energies which should have faithfully been devoted to advancing the interests of the partnership. It must be remembered that Reingold and Stark had expressly agreed to devote their entire time and efforts to their partnerships and Paramount-Hudson, Inc.; the inferences to be drawn from the testimony clearly indicate that the efforts of Reingold in connection with the Jersey City and Elizabeth operations may not justly be dismissed as insubstantial.

We are satisfied that Reingold's behavior was in disregard of his fiduciary obligations to Stark and contributed to their present difficulties; and we incline to the view that Stark's conduct was of somewhat like nature and had somewhat like effect. Stark should clearly have taken steps towards the complete withdrawal of his brother from the business as soon as Max appeared to be a disruptive factor; instead he encouraged Max to seek legal entry into the partnership and actually signed the agreement of June 9, 1952 in which he formally declared that he held his partnership interest in Rein Motors and Bergen County U-Driv-It "for the equal benefit of himself and" his brother. This agreement violated the purposes underlying Stark's original undertaking not to assign his share in the partnership "or enter any agreement as a result of which any person shall become interested with him in the partnership." We accept Stark's position that the agreement, as such, was not a contributing factor in the disruption of the partnership's affairs, although Stark's antecedent failure to seek his brother's withdrawal undoubtedly did contribute. Stark now asserts, however,

that whatever may have been the underlying causes, the relationships between himself and Reingold are so strained that dissolution is the only solution which would equitably serve the private and public interests concerned; he states unequivocally that he would not have appealed the Chancery Division's judgment of dissolution were it not for its provision that Reingold could continue the partnership business upon payment of fair market value, exclusive of good will. Reingold likewise wants dissolution as evidenced by his testimony that he would not be satisfied to continue in partnership with Stark under the terms of their original partnership agreements and that since Stark had started the proceedings for dissolution he intended to try to finish them. However, Reingold desires to retain the important benefits of the Chancery Division's judgment entitling him to continue the partnership business upon payment of fair market value exclusive of good will. In view of his own serious misconduct, he is not entitled to those benefits; it seems to us that in the light of all of the circumstances the equitable procedure would be to dissolve the partnerships, liquidate their affairs and distribute the proceeds share and share alike between the partners in accordance with their interests therein. *R. S.* 42:1-32 provides that the court shall decree a dissolution where the circumstances render such action equitable, and *R. S.* 42:1-38(1) provides, upon such dissolution, for the payment of partnership debts and the distribution of surplus to the partners. And there are judicial decisions which clearly recognize the court's broad power to direct dissolution, liquidation, and equal distribution where, as here, the relations have become so strained and the mutual confidence so impaired, through the contributing fault of both partners, that it is no longer just or equitable that the partnership be continued. See *Sieghortner v. Weissenborn,* 20 *N. J. Eq.* 172, 177 (*Ch.* 1869), modified 21 *N. J. Eq.* 483 (*E. & A.* 1869); *Warwick v. Stockton,* 55 *N. J. Eq.* 61, 64 (*Ch.* 1896); *Baxter v. West,* 1 *Dr. & Sm.* 173, 62 *Eng. Rep.* 344 (1860); *Mayhew v. McGlothlin,* 269 *Ky.* 184, 106 *S. W. 2d* 643 (1937). *Cf. Crane, supra,* at 413;

Note, *Misconduct of or dissensions among partners or joint adventurers as ground for dissolution by court*, 118 *A. L. R.* 1421 (1939).

In the *Sieghortner* case Chancellor Zabriskie said:

"The partnership will also be dissolved where all confidence between the parties has been destroyed, so that they cannot proceed together in prosecuting the business for which it was formed. And this result follows not only when such want of confidence is occasioned by the misconduct or gross mismanagement of the partner against whom the dissolution is sought, but when such want of confidence and distrust has arisen from other circumstances, provided it has become such as cannot probably be overcome. But a partner who, by his own willful misconduct, has caused such want of confidence, will not be allowed to take advantage of it to procure a dissolution. *Harrison v. Tennant*, 21 *Beav.* 482; *Baxter v. Welsh*, 1 *DeG. & Sm.* 173; *Lindley on Part.* 185, 186; *Collyer on Part.*, § 297."

In the *Warwick* case Vice-Chancellor Pitney cited the *Sieghortner* case with approval, noting that "It may be that the disagreements between the parties have been so severe, and their relations have become so strained, that, if this were an ordinary partnership, the successful conduct of which required mutual respect and confidence between the partners, the court might well decree a dissolution." And in the *Baxter* case the vice-chancellor (Sir R. T. Kindersley) pointed out that where the improper conduct of both parties had brought about the difficulties the continuation of the partnership would be "pernicious to both parties" and that a dissolution should accordingly be ordered. *Cf. Harrison v. Tennant*, 21 *Beav.* 482, 52 *Eng. Rep.* 945 (1856); *Crane, supra,* at 413; 40 *Am. Jur.* 302 (1942).

Stark contends that Paramount-Hudson, Inc. should be dissolved under the deadlock statute (*R. S.* 14:13–15), along with the partnerships, and he filed a separate complaint in the Chancery Division seeking such relief. Reingold's answer resisted this and in his counterclaim he alleged (1) that the complaint constituted an offer by the Starks to sell their shares under the terms of the earlier agreements between the parties, and (2) that the agreement of June 9, 1952 between Philip and Max Stark entitled Reingold to purchase the

stock held by Max Stark after Philip Stark had failed to exercise the option set forth therein. The Chancery Division rightly rejected the counterclaim; and it denied the relief sought by the complaint on the ground that there had been "no showing of a stalemate in corporate management." *Cf. In re Collins-Doan Co.*, 3 *N. J.* 382, 396 (1949); *RKO Theatres, Inc., v. Trenton-New Brunswick Theatres Co.*, 9 *N. J. Super.* 401, 409 (*Ch. Div.* 1950); *Note, Dissolution of corporation on ground of intracorporate deadlock on dissension*, 13 *A. L. R. 2d* 1260 (1950).

The membership of the board of directors of Paramount-Hudson, Inc. and its voting shares are equally divided between the Starks and the Reingolds. The corporation owns real property including the premises occupied by Bergen County U-Driv-It and Rein Motors which pay low rentals to it. The corporation has never declared a dividend and there have been no meetings of directors or stockholders since February 1952. Philip Stark testified that in the course of his discussions with Reingold he had tried "to call meetings time and again" to discuss dissolution of the corporation along with the partnerships, but Reingold persistently refused to do so. He testified further that he and Reingold "could not agree on anything" and that when he tried to call a meeting to discuss what rentals were being paid to the corporation and what was happening to its funds, Reingold "would not go along." Reingold denied that any one had ever requested that he call a meeting to consider dissolution of the corporation and testified that he would oppose such dissolution. He denied that the formation of the corporation and the partnerships was regarded by the parties as a single enterprise; he described them as "the same business transaction, but with three separate parts to it." Apparently he was not called upon to say whether he would still wish the corporation to continue in its present form if the partnerships were dissolved and liquidated.

 *R. S.* 14:13–15 provides for dissolution of a corporation by judicial decree where the directors and shareholders are evenly divided between conflicting factions with resulting

impairment of the proper corporate function. In actual terms it is sufficiently comprehensive to justify its application here. The relations between the Starks and the Reingolds have been too seriously breached to suggest future agreement and decent corporate operation. The corporation and the partnerships were admittedly created in an intertwined transaction; indeed, the agreement between Stark and Reingold for the formation of the corporation expressly provided that they shall devote their entire time and efforts to the affairs of the corporation, "except as to their joint management of any partnership interest between them." It seems to us that with the dissolution of the partnerships by judicial direction it would not be fair to either party to require continuation of this provision; indeed, we are convinced that under the compelling circumstances presented the just and proper course would be to direct that the corporation be dissolved along with the related partnerships. *Cf. Flemming v. Heffner & Flemming,* 263 *Mich.* 561, 248 *N. W.* 900 (1933); *Guaranty Laundry Co. v. Pulliam,* 200 *Okl.* 185, 191 *P. 2d* 975 (1948). *See Hornstein, A Remedy for Corporate Abuse—Judicial Power to Wind up a Corporation at the Suit of a Minority Stockholder,* 40 *Col. L. Rev.* 220, 224 (1940), where the author noted that "It would seem almost axiomatic that fundamental legal principles empower a court of equity to order the winding-up of a corporation where it is just and equitable to do so."

Stark contends that certain property located in Little Ferry and purchased in the names of the Reingolds was a partnership asset and he unsuccessfully sought judgment to that effect in the Chancery Division. Mr. Culuko, an employee of Rein Motors, owned the property and offered to sell it to Reingold for $16,000. Stark testified that Reingold asked him whether "it would be all right if the partnership" bought the property and that he said it would be. The Chancery Division found that $500 was paid as a deposit and that $250 thereof was contributed by Stark and the remaining $250 by Reingold. The property was taken in the names of the Reingolds and their brief asserts that "un-

doubtedly this was done initially as a matter of convenience, the intent being that Philip Stark should have a one-half interest therein as an individual." The property was repaired and Reingold concedes that Rein Motors paid for the repairs. Reingold made formal application for an FHA mortgage loan and he falsely represented that the property had been purchased for $20,000. Stark testified that he refused to sign the mortgage application and that thereafter Reingold declined to recognize his interest in the property. On the other hand, Reingold testified that he had never asked Stark to sign the application and that he had considered him as his partner until legal proceedings were instituted; he testified further that if Stark had ever tendered an agreement indemnifying him with respect to the mortgage he would "certainly consider him a partner in this venture." When Reingold learned that criminal prosecution might flow from his false application, he paid off the mortgage and the property is apparently now unencumbered.

 In rejecting Stark's claim, the Chancery Division took the position that "Stark is demanding a ½ interest in property which cost $16,000, for which he has paid only the sum of $250" and that "to state the proposition is to answer it." We have a different understanding of Stark's claim. He now acknowledges that Reingold has a prior claim to the extent of the lien which Reingold individually paid off, and he is asserting only a one-half interest in any value which remains above that amount. To that extent he seems entitled to relief. The deposit must be considered as having been paid by Stark and Reingold as partners and the repairs were admittedly paid by partnership funds. The property belonged to the partnership notwithstanding title in the Reingolds and, subject to Reingold's prior claim with respect to the lien which he individually paid off, the property is now to be dealt with as a partnership asset. *Bacon v. Bacon,* 7 *N. J. Super.* 182 (*App. Div.* 1950), affirmed 6 *N. J.* 117 (1951); *R. S.* 42:1–8(2). The suggestion that the statute of frauds may be invoked to bar assertion of the claim that the property in the name of the Reingolds

was held in trust for the partnership is without basis. *Moses v. Moses,* 140 *N. J. Eq.* 575 (*E. & A.* 1947). See 3 *Scott on Trusts* (1939), § 406, where Professor Scott points out that "In the United States as well as in England it is held that statutes requiring a writing for the creation or enforcement of a trust are not applicable to resulting or constructive trusts."

In the light of our determinations we consider it unnecessary and indeed inappropriate that we deal further with the many tangential issues and claims which were presented in the briefs of the parties. Stark seeks no more and Reingold is justly entitled to no more than the relief here allowed. The judgment below is:

Reversed and the cause is remanded to the Chancery Division for further proceedings in accordance with this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For affirmance*—None.