WILLIAM J. EVANS,
Plaintiff,

*vs.*

FRANK A. GUNNIP,
Defendant.

*New Castle, September 24, 1956.*

*Januar D. Bove, Jr.,* of Connolly, Cooch & Bove, Wilmington, for plaintiff.

*Howard L. Williams* and *Arthur J. Sullivan,* of Morris, James, Hitchens & Williams, Wilmington, for defendant.

MARVEL, Vice Chancellor: In June, 1949, Frank A. Gunnip and Harry E. Deppert formed a partnership known as Deppert & Gunnip, in which on July 1, 1950, William J. Evans was employed as staff manager. The profession engaged in by the firm namely that of public accounting was one in which the firm partners had gained broad and varied experience in business careers dating from the mid 1930's. Plaintiff, a younger man and less experienced than the firm members, had left an accounting position in Philadelphia which paid him $350 a month to come to Deppert & Gunnip. He was told that he was virtually assured of being taken into the firm within a year of his employment, and in fact on July 1, 1951 he was made a partner. Plaintiff's earnings during his year as an employee were approxi-

mately $7,600. On becoming a partner plaintiff made no capital contribution and this fact is reflected in the formal partnership agreement executed in September 1951, which provided that in the event of sale of the partnership assets, the first $41,000 of the sale price would be divided on the basis of $20,000 each to Deppert and Gunnip and $1,000 to Evans, any excess over $41,000 to be divided on the basis and status of the partners' capital accounts as of the time of sale up to the value of said accounts, any excess to be distributed under the profit sharing provisions of the partnership. When Deppert left the firm on November 1, 1952, the partnership assets could be said to have had a value of $65,000, basing such estimate on a projection of the settlement with Deppert, he having had a 40% interest in the partnership earnings and assets.

While there is a conflict in the testimony as to whether Deppert voluntarily withdrew from the firm or was forced to leave, it is apparent that negotiations to settle Deppert's claim took into consideration the terms of the partnership agreement which provided that a withdrawing partner was entitled to receive a lump-sum payment of $10,000.[1] It also seems clear from documents in evidence that Deppert assumed that such payment was to be made in lieu of a withdrawing partner's interest in inventory of supplies, library, accelerated authorization of leasehold improvements as well as good will. Settlement negotiations also took into consideration Deppert's interest in moneys eventually to be realized on unpaid accounts and work in the course of completion in the office of the partnership at the time he left. Deppert valued his total interest in the firm at $42,000, a sum which Gunnip at first considered a reasonable figure. This estimate included a total of some $32,000 as capital, accounts receivable and work in process. Despite his initial complacency about

1. Par. 9(b) of the agreement provides in part "(b) The value of the interest of the Party withdrawing shall be as follows: (1) In the case of First Party (Deppert) and Second Party (Gunnip) Ten Thousand Dollars ($10,000) each, and in the case of Third Party (Evans) Five Hundred Dollars ($500), plus in the case of all three Parties, the book value of the withdrawing Party's capital account as of the effective date of withdrawal." The balance of the paragraph has to do with purchase by the remaining partners of a withdrawing partner's interest.

Deppert's claim, Gunnip took an active part in negotiating a settlement at the substantially lower figure ultimately agreed on, namely $30,000. Inasmuch as Deppert's demand from the beginning included a claim for good will, and despite vagueness in the testimony as to the actual basis for the compromise figure, I conclude that the scaled down negotiated settlement with him contained some element of payment for good will.

Prior to Deppert's severance of connection with the firm plaintiff and defendant had engaged in conversations about the formation of a new partnership, and such partnership was formed although its terms were never reduced to writing. While there is some vagueness as to the percentages to be shared by the partners, counsel now agree that 60% of net earnings of the new firm were to go to Gunnip and 40% to Evans, and that this ratio[2] should govern the accounting which Evans seeks. Defendant concedes that Evans is entitled to an accounting but contends that the amount due plaintiff should be computed on a cash basis not only because the partnership accounts were kept on such basis (at least for tax purposes) but for the further reason that plaintiff as a partner having become entitled to earnings only as they were realized, he should leave on the same basis.

This argument fails to take into consideration the fact that as a partner plaintiff not only acquired an interest in partnership assets but also became liable by statute for partnership obligations, *Title 6 Del.C.* § 1517. The interest of a partner is not measured by the formalities of bookkeeping and whether or not a particular asset or liability is posted in a book at a given time.

Recognizing that plaintiff's interest in the dissolved firm probably encompasses more than the mere cash on hand at the time of his leaving, defendant argues alternatively that if plaintiff is entitled

2. These percentages are arrived at by excluding Bernard J. Danney and William H. Ryan from partnership earnings. These two persons, who had been employed by the old firm, advanced moneys to the new firm, but these advances were treated as loans and not as capital contributions. Despite their apparent status as partners at the beginning of the new partnership they were consistently treated and were eventually paid off as employees.

to share in moneys realized by the firm after he left, such interest should be restricted to a sharing of moneys earned on work which was initially processed after plaintiff became a partner. Defendant argues that because plaintiff as a new partner in the firm shared in earnings derived from work in process on which work had been done before he became a partner, the work in process on the books of the firm as of the day he became a partner must be subtracted from that on the books on the day he withdrew in order to arrive at the dollar value of work in process in which plaintiff may now equitably share. The same theory is advanced by defendant in opposition to plaintiff's claim to a share of the accounts receivable.

There being no special contractual provisions providing otherwise, the general principles governing rights and obligations of partners compel rejection of defendant's argument. When Deppert left the firm, he became entitled to be paid his partnership interest as of the date of his departure even though such interest in work in process and accounts receivable had not been reduced to cash. This would appear to be in line with normal procedure on a partnership dissolution. At the same time plaintiff's interest as a partner immediately attached to the assets and liabilities of the new partnership with defendant. As partnership profits were realized and paid to him proportionately plaintiff became accountable for such payments as personal earnings. He cannot be forced in effect to give back what he has already earned. As a partner plaintiff did not confine his contribution of time and skill to the completion of the unfinished business on hand on Deppert's departure. He also applied himself to the new business which steadily came into the firm. The partnership matters here involved, as in the case of most business or professional associations of partnership, were a continuing operation. A withdrawing partner who has not only been responsible for past partnership obligations but who has also worked to build up future earnings (in the absence of special contractual arrangements or factors such as fraud and the like which are not present here) should not have his partnership interest appraised in the technical manner advanced by defendant. Plaintiff is entitled to his proportionate share of accounts receivable and work in process on what is in effect an accrual basis.

As of October 31, 1953, the partnership existing between plaintiff and defendant was dissolved, and this suit seeks an accounting of plaintiff's partnership interest as of that date. A great deal of the testimony and substantial parts of the briefs before me are devoted to the factors which contributed to the destruction of that necessary element of mutual trust and confidence which is essential to the successful operation of a partnership. When this takes place, a partnership because of its very nature is doomed and ready for dissolution either under its own provisions or under general principles of partnership law.

In my opinion it is unnecessary to review the pros and cons of the charges and countercharges advanced by the parties, their witnesses and counsel, the partnership having been one for no fixed term and subject to being dissolved solely on the whims of one of the partners, *Title 6 Del.C.* § 1531 (1)(*B*). I am satisfied that both plaintiff and defendant had by the fall of 1953 come to the parting of the ways and that plaintiff's ultimate decision to leave was merely recognition of the inevitable which defendant readily accepted. In brief I conclude that plaintiff's withdrawal from the firm was not wrongful in the sense that he is subject to having his tangible partnership interest diminished under any applicable Delaware statute or decisional law governing partnership dissolutions and accountings. The question remains, however, what is plaintiff entitled to receive from his former partner, Mr. Gunnip?

The parties agree that as of October 31, 1953, the effective date of dissolution of Gunnip & Evans, the uncollected balance of accounts receivable due the firm was $7,846.43, after Gunnip wrote off $2,011.50 [3] as uncollectible. The parties are also in agreement that as of this same date work in process in the dissolved firm had a value of $10,453.32. Defendant had written down the value of this work, which was transferred to the new firm of Gunnip, Isaacson and Stolper, to the extent of $4,780.45.[4]

3. Of this amount plaintiff claims accounts totalling $1,595 were collectible and should not have been written off.

4. Plaintiff claims $2,621.82 of this amount should not have been written off.

Finally in arriving at starting figures for computing plaintiff's interest in the dissolved firm, plaintiff charges that during the operation of the partnership, defendant did not account properly for services rendered by him for certain clients. Defendant concedes that he is accountable for two fees hereinafter referred to but denies plaintiff's charges concerning the Cullen Company account and an alleged improper stock purchase from American Superior Products Corporation. In the case of the latter company it is alleged that defendant failed to share with plaintiff an opportunity (which defendant took advantage of) to purchase its stock. Plaintiff also claims that defendant improperly settled with a Mr. Stump, whom defendant had hired in October 1953, at an annual salary of $10,000 to take over responsibility for processing unfinished business of the dissolved firm and whose services were no longer needed on merger of the assets of the firm with the newly formed partnership of Gunnip, Isaacson and Stolper.

Because of the wide break in personal relations between the parties as of October 31, 1953, a situation which made joint action of any kind impossible, the decision on what accounts to press for payment and what to write off was left in defendant's hands. Insofar as he made honest business mistakes he injured himself inasmuch as he is entitled to 60% of all accounts collected. Presumably defendant sought to avoid such self-injury. The principal write-off to which plaintiff objects is $1,000 owed by General Development Corp. The testimony discloses that this company in which the former partner, Deppert, serves as vice president, had been in financial difficulties for at least two years prior to the Gunnip & Evans dissolution. As to the smaller write-offs, I conclude they were justified under the facts and circumstances of the dissolution either because they were difficult if not impossible to collect or represented excessive charges.

Write-offs of work in process by Gunnip are also attacked by plaintiff as indicated above. In estimating Deppert's partnership interest on the earlier firm dissolution (defendant's exhibit 2) plaintiff tentatively wrote off $5,961.67 of work in process out of a total on the books of $28,451.34, a somewhat less drastic write-off than that now under attack but nonetheless substantial. As was the case with the

accounts, write-offs of work in process were left in Gunnip's hands. In my opinion he acted reasonably under the circumstances in a matter in which it was again to his financial interest to collect the maximum without destroying the possibility of future business. The accounts in question were either shaky and patently uncollectible or otherwise justifiably written off as in the case of the Brosius and Smedley project in which write-off was required because a responsible client could not be expected to pay for work which had proved abortive. Mr. Evans who had personally done the preliminary ground work was no longer available to complete what had been only tentatively begun. In view of these conclusions I accept the net figure [5] set forth above after write-offs as the basis for plaintiff's right to receive his fair share in accounts receivable and work in process.

As to the American Superior Products Corporation stock purchase plaintiff contends that defendant appropriated to himself a business opportunity which should have been shared with his partner. Admittedly a partner may not personally benefit in a business transaction at the expense of his partners, *Stark v. Reingold,* 18 *N.J.* 251, 113 *A.2d* 679, however, the purchase and sale of stock was not the business of Gunnip & Evans. The fact that American Superior Products Corporation was a client of the partnership and that this business relationship formed the basis for the opportunity to make the purchase does not alter my conclusion. While defendant used partnership funds for the purchase, his personal account was ultimately debited for the amount posted in a partnership suspense account. Defendant did not conceal the facts surrounding the transaction and committed no breach of fiduciary duty in failing to allow plaintiff to acquire a personal or partnership interest in the purchased stock.

Defendant's use of the Cullen Company car was a private arrangement and did not constitute a breach of fiduciary duty. Such use did not injure plaintiff and the fee arrangement with that company, while perhaps not entirely commensurate with defendant's

5. Plaintiff's attorney may suggest a provision to be inserted in the order to be entered in this case designed to preserve plaintiff's right in those written off items to which he takes exception.

normal charges, was a matter to have been worked out during the partnership. It is not a matter for consideration in this accounting action.

The hiring of Mr. Stump in anticipation of plaintiff's leaving would appear to have been a necessary and reasonable business decision on defendant's part in view of all the circumstances including defendant's state of health following a minor heart attack in March, 1953. Having hired Mr. Stump it was necessary to make a fair settlement with him when the job he had been promised failed to materialize. Defendant will not be required to account for the Stump payment.

Two minor matters require no discussion in view of defendant's concession that he is accountable for the amounts claimed. The American Superior Products Corporation salary received by defendant and a $300 payment to him from Spencer-Rose will be included in the accounting to which plaintiff is entitled.

There remains for consideration the question of good will, which is the most difficult question to resolve in this bitter litigation. Historically good will has not been considered an element on which a money value can be placed on the dissolution of a professional partnership. It was the English concept, which was taken over by American courts, that the skill and integrity of a professional man was personal to him and that it was impossible and indeed improper to attempt to fix a dollar value on such attributes, however, there had been authority to the contrary for some time. See comments in *Macfadden v. Jenkins*, 40 *N.D.* 422, 169 *N.W.* 151, and *Annotation* in 44 *A.L.R.* at *page* 524.

Furthermore, in recent years it has been recognized as a practical matter that professional good will is a factor to be considered in the appraisal of the assets of an accounting partnership on their sale, transfer, or merger with the assets of another partnership. In other words when an active partnership business is sold or otherwise turned over to a competitor, the partners selling out can and do ask that their reputations for skill, their punctuality or the like be

given a dollar value [6] particularly where assurances are given that the partners selling out will not compete with the buyer. I see no reason why the statutes governing partnerships and the decisions involving the sale or transfer of assets of purely commercial partnerships are not applicable to the situation here found, namely, an accounting partnership in dissolution and the subsequent merger of its assets including good will with another accounting firm.

After trial the Court suggested a conference with counsel and by stipulation the agreement under which defendant became a partner in the firm of Gunnip, Isaacson & Stolper was marked in evidence as plaintiff's exhibit 31. This agreement (*par.* 14) specifically fixed values on the partners' interests in good will, Gunnip's and Isaacson's being valued at $100,000 each and Stolper's at $40,000. These valuations were made subject to reappraisal annually and for the purpose of purchasing a deceased partner's interest insurance was taken out on the partners' lives in the amounts of the initial estimates of their interests in good will. The agreement fixes the value of a withdrawing partner's interest in good will at 75% of the amounts set forth in the agreement subject to being reduced as a result of the loss of accounts to a partner who withdraws to compete.

The terms on good will mean that Gunnip took into the new firm more than just tangible assets, that he contributed an intangible asset of good will and that this asset had value. Defendant must account to plaintiff as to such item, *Kennedy v. Yost, 32 Del.Ch.* 386, 88 *A.2d* 297. In taking a salaried position with the Benjamin J. Shaw Company, in retaining only one substantial account and in making some effort to encourage other important accounts which he had handled to remain with Gunnip, plaintiff on the other hand received no immediate benefit from such good will. The question remaining

---

6. In tax cases good will of an accounting firm has been considered as a matter separate and distinct from a covenant not to compete and given a value as such, *Horton v. Commissioner of Internal Revenue,* 13 *T.C.* 143, appeal dismissed 10 Cir., 180 *F.2d* 354, *Wyler v. Commissioner of Internal Revenue,* 14 *T.C.* 1251. This distinction is tied in with tax concepts of capital gain as opposed to earned income.

is how to determine plaintiff's interest in this intangible element which Gunnip carried with him into the new firm.

Various methods are used in arriving at a dollar figure for good will in the purchase and sale of assets of an accounting partnership. One method is to capitalize average net income by multiplying it by a factor of 3 to 6, or even 1 to 10.[7] Another method is to take 75% to 100% of net billings as a fair dollar figure for good will. Plaintiff submits figures which he contends establish annual firm billings of from approximately $94,000 in the year ending June 30, 1952 to in excess of $158,000 for the year ending June 30, 1953 and of net earnings of $32,000 in the earlier year to over $60,000 in the latter year. These wide fluctuations cover part of the earlier period of association with Deppert and because of the brevity of the association between the parties do not give the broad picture of earnings over a number of years usually looked for by a prospective buyer of the assets of an accounting partnership. Furthermore these figures cover a period of high business activity in the Wilmington area during a high tax era when many businesses for the first time found it to their advantage to engage an outside professional accountant. Both Deppert and Gunnip anticipated this need, studied the ground carefully, and entered the field at a singularly auspicious time.

Using both methods of appraisal described by the witness, Carroll, and referred to above, plaintiff estimates the good will of the dissolved firm of Gunnip & Evans to have a value of from $102,412.67 to $127,352.26. Plaintiff claims to be entitled to 40% of such value as may be found to be attributable to the good will of the business.

For the reasons already given and for a number of other reasons, I cannot accept plaintiff's figures. Deppert had no such sum[8] in mind when he asked to be paid something for good will, and plaintiff (as was the case on Deppert's withdrawal) has made no binding covenant which would bar him from returning to private practice as

7. See *Blut v. Katz,* 36 *N.J.Super.* 185, 115 *A.2d* 119, for a general discussion of methods of computing good will in a mercantile dissolution.

8. See Deppert letter of January 16, 1953 (plaintiff's exhibit 3) "(3) The sum of $10,000 in lieu of inventory of supplies, library, accelerated authorization of leasehold improvements, as well as good will."

an accountant. If his interest in good will were as great as he visualizes it, by returning to private practice he would be in a position to recover many of the accounts which he left with Gunnip.

In my opinion, however, plaintiff's claim for good will is grossly overstated. I am convinced that good will is to a large extent personal and that plaintiff's contributions to the creation of partnership good will did not measure up to those made by his older and more experienced partners, Deppert and Gunnip. The life blood of the partnership assets here involved found its source in business forwarded by what was then The Security Trust Company and other banks and by certain attorneys. Deppert and Gunnip were the ones who drew this business to the firm. Plaintiff's role as a business getter was relatively a minor one though I have no doubt but that he performed competent work and came to do most of the work for certain important clients such as the O'Toole interests.

It can also be assumed that because of the steady erosion of confidence and trust not only between the parties but before that between the parties and Deppert that there was a general damaging of the partnership and its good will to the injury of all concerned. Perhaps such a conclusion is not supported by concrete evidence, but whether or not a falling off in partnership business in process was due to economic or [9] personal reasons such had occurred by [10] November 1, 1953 according to plaintiff's own figures. In February 1953, plaintiff estimated Deppert's 40% interest in partnership assets (exclusive of good will) as of November 1, 1952 to be $23,802.93. He estimates his 40% interest in the firm as of October 31, 1953 (exclusive of good will but inclusive of a number of items rejected by the Court) to be approximately [11] $19,000.

9. A minor heart attack suffered by defendant in March 1953 was a blow to the well being of the partnership. Defendant was faced with the problem of lessening his work load and explored the possibilities of setting limits on the partnership practice or of selling its assets.

10. Shortly after November 1, 1953, the dissolved firm lost the Benjamin F. Shaw account which had provided some $11,500 of business annually.

11. The final order herein will be based on plaintiff's claim including capital contribution as analyzed in plaintiff's exhibit 30, subtracting therefrom the items disallowed by the Court and adding good will.

Evaluing and applying to the net billings or earnings theories of good will the factors which lessen plaintiff's interest in good will is an act of appraisal for which there are no fixed guides. Certainly there is no arithmetical formula which will give plaintiff what he is entitled to receive. One can merely hope to arrive at a figure [12] which is fair to both parties in the light of all the facts and circumstances. The diminishing factors referred to above lead me to the conclusion that plaintiff's interest in partnership good will on October 31, 1953 had a value of $10,000.

The Court requests further briefing and perhaps argument on plaintiff's claim for interest and counsel fees before a final order is entered directing an accounting in conformity with this opinion and dismissing defendant's counterclaim.[13]

---

12. While the good will of the dissolved firm of Gunnip & Evans had a theoretical value of approximately $100,000 as of November 1, 1953, this figure is obviously out of line with realities when one considers defendant's tentative price tag of $100,000 on the entire assets including good will of Gunnip & Evans in his discussions with Leslie, Banks & Company in the summer of 1953. Plaintiff estimates the adjusted net worth of Gunnip & Evans as of October 31, 1953, exclusive of good will, to have been $74,767.27 (plaintiff's exhibit 21).

13. Defendant did not present evidence in support of his counterclaim and does not discuss it in his brief.