The principles of law by which the present applications must be determined are settled, and are in the main assented to by the counsel of both parties, and are established by the authorities and cases cited by them.
In suits between partners to dissolve a partnership, a receiver will not be appointed, or an injunction granted or continued to restrain a partner from acting, unless the facts shown are such as would, upon the final hearing, entitle the complainant to a decree of dissolution; and when such facts are established, in general a receiver will be appointed, and the defendant enjoined from disposing of or meddling with the partnership property. The injunction follows the appointment of a receiver, almost as a matter of course. Birdsall v. Colie, 2Stockt. 63; Cox v. Peters, 2 Beas. 40; Goodman v. Whitcomb, 1 Jac. W. 569; Smith v. Jeyes, 4 Beav. 503.
Courts of equity will, for sufficient cause, dissolve a partnership before the expiration of the term for which it was entered into. And it is a sufficient cause for dissolution, that it clearly appears that the business for which the partnership was formed is impracticable, or cannot be carried on except at a loss. The object of all commercial partnerships is profit, and when that cannot be obtained, the object fails, and the partnership should be terminated. Baring v. Dix, 1Cox 213; Jennings v. Baddeley, 3 Kay Johns. 78; Bailey v. Ford, 1 3Sim. 495. And this doctrine is adopted and approved by elementary writers of learning. Collyer on Part., § 291; Story on Part., § 290.
The partnership will also be dissolved where all confidence *Page 178 
between the parties has been destroyed, so that they cannot proceed together in prosecuting the business for which it was formed. And this result follows not only when such want of confidence is occasioned by the misconduct or gross mismanagement of the partner against whom the dissolution is sought, but when such want of confidence and distrust has arisen from other circumstances, provided it has become such as cannot probably be overcome. But a partner who, by his own wilful misconduct, has caused such want of confidence, will not be allowed to take advantage of it to procure a dissolution. Harrison v. Tennant, 21Beav. 482; Baxter v. Welsh, 1 DeG. Sm. 173; Lindley on Part. 185, 186;Collyer on Part., § 297.
In this case a partnership had been entered into on the 9th of February, 1864, between Seighortner, Weissenborn, and Joseph Schedler, for the manufacture of lead pencils and globes. The partnership was for twenty-five years; each partner was to advance $4000 capital; and Seighortner was to receive interest, at the rate of six per cent., for all moneys advanced by him for the business of the firm, beyond the sum of $4000.
On the 9th of April, 1868, the partnership was dissolved by the withdrawal of Schedler, and new articles were entered into by Seighortner and Weissenborn, for the term of twenty-five years from that date. By these they assumed the assets and debts of Schedler, and all the assets and liabilities of the old firm.
They declare that they are indebted to Mrs. Seighortner, the wife of Seighortner, for the total amount of the loans advanced by her as a chattel mortgage on and in the business, and that they will pay her interest thereon at the rate of six per cent.
The articles do not declare what should be the business of the new firm, but it was understood by the partners that it should be the manufacture and sale of lead pencils, exclusively; Schedler, who was a manufacturer of globes and playing cards, which were manufactured by the former firm, *Page 179 
having taken with him as his part of the assets, the tools and materials for making globes and cards.
It satisfactorily appears that the debts to Mrs. Sieghortner, for loans by her, mentioned in the new articles of partnership, were intended to represent the debts of the old firm for the advances made by Sieghortner beyond his $4000 of capital, provided for in the old articles of partnership. Sieghortner had made a will, giving all his property to his wife. He was ignorant both of the rules of law and of all business transactions, and supposed that the effect of this will was to transfer all these debts to his wife.
Sieghortner had advanced to the old firm a large amount of money beyond the $4000 put in as capital, and had withdrawn a very trifling sum. That his advances were large, is not denied by Weissenborn, but the amount is disputed. He claims that his advances amount to $325,000; Weissenborn does not state any amount. I think it satisfactorily appears that on the 1st of October, 1865, they amounted to $109,700, and that they were largely increased before June 9th, 1868.
F. X. Schedler, a partner of Sieghortner in the restaurant business, the firm by which the money was advanced for Sieghortner, testifies that he kept the account both of the advances and receipts, and that on May 1st, 1868, the balance of the advances by Seighortner was $261,999.57, and that from May to November, 1868, they advanced the further sum of $17,723.30, making in all $279,722.87. This seems to me extravagant and improbable, yet it professes to be taken from an accurate account kept at the time.
Yet the account exhibited by Weissenborn, in Schedule A, in the evidence, and the items evidently omitted in it, show that the advances of Sieghortner must have been large, on the assumption that he advanced all the capital needed.
The expenditures there stated are $325,911.11. This account does not include advertising, store and office charges, salaries, interest, or the general factory account, which items the complainant's evidence states amounted to $127,950. These are all charges of a kind that must no doubt have *Page 180 
been incurred. Weissenborn estimates the general office charges at $35,000; but this does not include the other charges above mentioned. This, added to the $325,911.11, will make $423,661.11. From this, if we deduct the value of the pencils sent to the store, as estimated inSchedule A, $283,933 69, it leaves about $140,000; or if we deduct the actual amount of sales, $205,000, as ascertained from the books of internal revenue, it would leave about $218,000, which must have been advanced by some one. I cannot avoid coming to the conclusion that there has been advanced by Sieghortner, or through him in a way to make him individually responsible for it, at least $200,000 for the use of the firm, which is a debt to him.
In this situation he was unwilling to go on further, on the idea that the firm was losing, and getting further in debt, and that it could not go on without more capital, which he was unwilling, and Weissenborn was unable, to advance. In the early part of December, he told Weissenborn that he was not willing that the concern should go on. Weissenborn says he threatened to put the establishment in the hands of the sheriff, and put them all out; but this threat Sieghortner denies, and there is no witness to turn the scale between them; but it is plain that Sieghortner was dissatisfied, and expressed his dissatisfaction.
In this situation of affairs, Weissenborn, without the knowledge of Sieghortner, purchased of one Patrick Murray, in New York, a quantity of black lead at $5000, on the credit of the firm. This lead was not immediately needed, but was for supply for some time ahead. It was not delivered at the factory at Hudson City, or at the office of the firm in New York. Murray swears be delivered it to Weissenborn, but at what place does not appear; it never came to the possession of Sieghortner. This purchase was on the 5th of December. About the 20th of December, a suit for the price was brought in New York, the summons was served on Weissenborn when he was in the city, of which he gave no notice to Seighortner, who was not served, though a *Page 181 
resident of the city, and who did not know of the purchase or suit until execution was levied upon the property of the firm in New York. Murray offered to take back the lead in satisfaction of the judgment, but to this Weissenborn would not consent unless Sieghortner would convey the whole concern to a stock company, in which they would each have an equal number of shares, as the price of it.
On the 14th of December, 1868, about five o'clock in the evening, Weissenborn went to the factory with Murray, and a truck belonging to Murray, and removed from the factory pencils and unfinished pencils of the value of $10,000, which were taken to Murray's store, in New York, and stored there. This was done without the knowledge or consent of Sieghortner, and no account was left or entered on the books of the factory. Sieghortner, upon hearing this, complained to a justice of the peace, that Weissenborn had stolen the goods, and had him arrested. He further stated, on his sworn complaint, that he had cause to suspect that Weissenborn would return to destroy his property by fire or otherwise.
Weissenborn alleges that he applied to Sieghortner, through Gustavus Weissenborn, his brother, for consent to go on if lie could raise $7000 by selling or pledging pencils, and that Sieghortner consented. Gustavus swears to the consent, and Sieghortner denies it, under oath. Weissenborn shows that he went with Patrick Murray to respectable counsel to ask whether he, as partner, had a right to sell the goods of the firm, for the purposes of the partnership, and he was advised that he had such right, and alleges that he removed the goods by virtue of this consent, and under this advice.
Whether the undertaking was a failure, and profit impracticable, is a mere question of fact; and while it is the established doctrine of this court to put an end to the partnership, where it is evident that no profit can be realized from the undertaking, yet the evidence must be clear, and there must be no doubt as to the fact. In this case, there is a conflict in the testimony; the evidence and accounts, on part of *Page 182 
the defendant, seem to show that, as far as the mere manufacture of pencils is concerned, it may be carried on at a profit. These estimates, it is true, omit several branches of expenses that are unavoidable, and so far as the past is concerned, fail to convince me that any profit has been realized out of the manufacture of pencils. On the other hand, the accounts and evidence on the part of the complainant, show a considerable loss in this branch of the business; but the books from which these accounts are taken so far as exhibited, do not seem to be kept in a regular manner, and are not to me satisfactory; yet in some of the principal items, the accounts of the complainant and defendant do not differ very greatly. The defendant alleges that 78,000 gross of pencils were sent to the store, at New York, for sale; the complainant's accounts state that 75,000 gross were sent. The defendant states that $122,000 was expended for labor; the complainant's accounts charge $127,000 wages. The chief discrepancy is in the price of the pencils, and in the amounts charged by complainant for salaries, office, and store charges, taxes, interest, advertising, c., which are altogether omitted in the defendant's statements. But while by collating these accounts and correcting them by each other, I can with confidence arrive at the conclusion that no profit has as yet been realized from the manufacture of pencils, I am not convinced that no profit could be made if the partners had sufficient capital, and could unite to carry on the manufacture and sale harmoniously, and with economy and energy.
But capital is needed to carry it on, and Weissenborn is unable to advance any, and Sieghortner is unwilling, if not unable, to advance more; and is unwilling to continue the amount which he has advanced, beyond his share of the capital, any longer in the business. If the allegations of the defendant are true, the firm has already lost more than its original capital, and is really insolvent. The original capital was $12,000, of which $4000 was in cash, $4000 in patents of Weissenborn, and $4000 in patterns and materials *Page 183 
for globes furnished by Joseph Schedler. Schedler took his patterns and materials with him when he retired; and the defendant alleges in his answer that $35,000 was lost in the attempt to manufacture globes and cards, and that $30,000 more was lost by the attempt of Sieghortner to hurry the manufacture of pencils, in the absence of Weissenborn, in Europe. Neither of these losses was taken into consideration in my arriving at the conclusion that the manufacture of pencils hitherto, had not realized any profit; and either of these losses by itself is sufficient to sink the whole capital several times over. The real estate of the firm may have increased in value, but it would be contrary to the usual result in such cases if the building and machinery erected or altered to adapt them to this business, could be disposed of without loss, and this would probably, at least, equal any increase in the value of the land.
If these views are correct, and Sieghortner is unwilling to advance more funds, and insists upon being paid the moneys loaned, it is utterly impracticable to go on with the business, whether pencils can be manufactured at a profit or not. Sieghortner has rights as a creditor, besides his rights as a partner; like any other creditor loaning money without any agreement as to time, he has a right at any time to demand payment; he is not bound further to risk his loan in a losing business. This demand being against a firm of which he is a member, cannot be enforced at law, and his only relief is in equity; and a court of equity cannot refuse to give relief, where so clear a right exists, without any remedy at law. I think that for either of these reasons: first, that in the present situation of affairs, the business cannot be carried on, and is therefore impracticable; and, secondly, that the complainant as a creditor is entitled to have his loans to the firm repaid through the interference of this court; a receiver should be appointed.
The other ground urged for the dissolution of the partnership seems to me to be sustained. The confidence between these partners is destroyed in such a manner that *Page 184 
they can never carry on and prosecute the business jointly and harmoniously. This difficulty and want of harmony exists; in point of fact, it was admitted by the counsel of Weissenborn on the argument, and the facts out of which it arises are established by the pleadings and proofs on both sides. And in my opinion, Sieghortner is not wholly or even chiefly in fault in the matters from which this state of affairs arises.
Weissenborn was guilty of gross misconduct and mismanagement in the purchase of the lead in December, 1868. He knew that the concern had met large losses, that the business was not prosperous, that all or almost all the money had been furnished by Sieghortner, and that Sieghortner was uneasy and wanted to get out of the business; yet in this situation of affairs, he involved the firm in a debt of $5000 for an artiticle of which there was no immediate need, which was not delivered to them, and for which there were no funds to pay. He had the legal right to purchase, and make the firm liable. But this purchase, under these circumstances, was a wrong to his partner; and the manner in which it was made and in which the judgment was obtained, must inevitably destroy the confidence of Sieghortner in him; his excuses for his conduct may in the eyes of others palliate it, but can hardly be expected to pacify Sieghortner. And after a full consideration of the evidence on both sides, I cannot entirely free myself from the conviction that the whole affair was got up between Weissenborn and Murray, for a purpose not consistent with his duty to Sieghortner.
In the next place, the removal of the finished and unfinished pencils on the evening of December 14th, and the manner in which it was done, was a wrong, and was gross misconduct. This, again, was done with the aid and in the presence of Murray, in whose store and possession the pencils were left. The excuse is that Sieghortner had told the brother of Weissenborn that he might go on with the business if he could raise $7000 by a pledge or sale of pencils. If we take this as proved, (though there is only the oath of *Page 185 
the brother against the denial of Sieghortner), yet this would not excuse the removal of a mass of pencils finished and unfinished, by night, without the knowledge of Sieghortner, without any memorandum or account left at the factory, or entered on the books, and storing them in some place unknown to Seighortner, when no arrangement had yet been made for sale or advancement on them as a pledge. It is difficult for me to believe that these goods were removed for sale or pledge for the object alleged; and the fact that he and Murray went to counsel for advice as to the legality of the strange movement they were about to make, is no proof of its good faith. These goods were returned to the factory, but not until after this suit was begun. This transaction was sufficient to destroy all confidence by his partner in him.
The arrest of Weissenborn, on the complaint of larceny, of course would destroy all confidence; but this was the act of Sieghortner. The complaint was no doubt wrong, as the transaction has been explained: yet the circumstances under which it was made will go far to excuse, though they may not justify Seighortner. The removal was at night, if not stealthily, at least .secretly, and without the knowledge of one of the real owners, and of the one who had the greatest if not the sole interest in the goods; and to a place and for a purpose which were concealed from him. It is not surprising that Seighortner should infer that the object was to appropriate the goods unlawfully, or that he or a justice of the peace, or even the recorder of Hudson city, should conceive that the offence was larceny. If such had been the object, it was laroeny morally if not legally. And I am not satisfied that a partner may not be guilty of larceny of the property of his firm, as if he should himself take from the safe of the firm a large amount of money or securities, when he is in debt to the firm, and without consent or knowledge of his partner, stealthily appropriate them to his own use in such way that it could not be known by whom they were taken. To me, the taking of these goods in the manner in which it *Page 186 
was done, appears a greater wrong than the charge of larceny.
I think that a want of confidence exists which is sufficient to dissolve this partnership, and that it is chiefly owing to the improper conduct of the defendant.
A receiver must be appointed, and the injunction continued.*
* Decree reversed so far as related to appointment of receiver; injunction continued until final hearing upon terms, 6 C. E. Gr.
483. *Page 288