142 N.J. Super. 546 (1976)
362 A.2d 78
68TH STREET APTS., INC., A NEW JERSEY CORPORATION, ET AL., PLAINTIFFS,
v.
CASIMIRO LAURICELLA, D/B/A CASS ELECTRIC CO., DEFENDANT. CASIMIRO LAURICELLA, D/B/A CASS ELECTRIC CO., PLAINTIFF,
v.
INTROCASO CONSTRUCTION CO., INC. AND RALPH L. INTROCASO, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided May 13, 1976.
*549 Messrs. Gigante & Aslanian, attorneys for Casimiro Lauricella, d/b/a Cass Electric Co. (Mr. Antranig Aslanian, Jr., appearing).
Messrs. Platoff, Heftler, Harker & Nashel, attorneys for Introcaso Construction Co., Inc. and Ralph L. Introcaso (Mr. Howard M. Nashel appearing).
GAULKIN, J.S.C.
These consolidated actions arise out of a complex of business relationships entered into by Casimiro Lauricella and Ralph L. Introcaso with respect to two properties known as 6818 Park Avenue and 138-142 68th Street, both in Guttenberg, New Jersey.

I. 6818 Park Avenue

In early 1972 Lauricella, an electrical contractor, learned that 6818 Park Avenue was available for purchase and contacted Introcaso, a building contractor known to him from other projects, who expressed interest in their jointly purchasing and developing the property. After determining that an apartment building of approximately 30 units could be accommodated on the site, Lauricella and Introcaso negotiated with the then owner and reached agreement on a purchase at $70,000.
Lauricella and Introcaso then orally agreed that they would participate equally in the purchase and ownership; that they would use Mario M. Polcari, Esq. as their attorney; that they would hold the property in corporate form; that Introcaso's company, Introcaso Construction Co., Inc. (ICC) would be the general contractor for the contemplated construction, and that Lauricella, who was a major stockholder of certain banks, would arrange the necessary financing.
*550 Pursuant to that agreement Lauricella and Introcaso formed 6818 Park Avenue Corporation (6818), a New Jersey corporation; each was issued five shares of common capital stock, the only corporate stock then or thereafter issued. The minutes of the initial corporate meeting recite that Lauricella was elected president and Introcaso secretary and treasurer; they do not indicate any election of directors, and neither the by-laws nor the certificate of incorporation fix the number of directors authorized. Lauricella contributed $35,000 to the capital of the corporation and Introcaso contributed $34,134, which funds were used for the purchase of the title.
Construction commenced in October 1972 but, as more fully discussed below, the project aborted and on April 16, 1973 Introcaso filed an action in the Chancery Division (Docket C-2943-72) to dissolve 6818 under N.J.S.A. 14A:12-7 by reason of deadlock. By order there entered on August 31, 1973, 6818 was dissolved; Thomas M. Venino, Esq. was appointed as receiver; and the process of making distribution to creditors and winding up the corporate affairs was initiated. Following extensive hearings conducted by him pursuant to N.J.S. 14A:14-16, the receiver filed his findings concerning the creditors' claims. His determinations were upheld by order entered September 19, 1975. In light of those findings in the Chancery Division action (which was consolidated with this proceeding until its disposition), this court determined, by order entered December 19, 1975, that the parties here are collaterally estopped from litigating the following factual determinations:
1. That there was a verbal agreement between ICC and 6818, the terms of which are set forth in the opinion of the receiver dated November 1, 1974;
2. That 6818 breached that agreement;
3. That as a result of that breach, ICC sustained damages of $88,494.41.
The terms of the agreement between 6818 and ICC incorporated by reference in the December 19, 1975 order *551 and thus deemed to be a finding of fact herein, were found in the Chancery Division to be as follows:
They [i.e., Introcaso and Lauricella] further agreed, orally, that ICC would act as the general contractor and would deliver to the owner corporation a "turnkey" 30 family apartment building at cost plus 8% for ICC's services and efforts. ICC was to have the option of performing any of the sub trades at cost plus 15% overhead plus 10% profit so long as that gross cost did not exceed a competitive price. Similarly, [Lauricella], an experienced electricial contractor, could elect to perform the electrical work on the project at cost plus 15% overhead plus 10% profit so long as that gross cost did not exceed a competitive price. I find that the parties understood that so long as the costs were reasonable and competitive, ICC would perform the masonry portion of the project since it was an experienced mason contractor and that [Lauricella] would perform the electrical portion for the same reason. Although there was a conflict as to whether ICC would be entitled to an 8% overwrite on the masonry work performed by it or on the electrical work performed by [Lauricella], I find from all the evidence that the intention of the parties was to compensate ICC at the rate of 8% on subcontracted work for its services as general contractor, and also on the work it performed as masonry contractor and on the electrical portion of the project whether performed by [Lauricella] or others.
In winding up the corporate affairs the receiver sold the real estate for $110,000 and, after deducting fees and expenses of the receivership, paid out all of the corporate funds to creditors, each creditor receiving approximately 84.51 cents on each dollar of claim. The major claimant was ICC, which received $74,785.90 on its allowed claim of $88,494.41. No return of capital was therefore available to Lauricella or Introcaso as stockholders.
The parties now assert the following claims:
1. Introcaso claims that Lauricella wrongfully and maliciously caused 6818 to breach its contract with ICC and thereby caused the project to abort. He seeks recovery for his losses as a stockholder and claims, derivatively, on behalf of 6818, the losses sustained by the corporation.
2. Lauricella contends that it was Introcaso himself who caused the breach of the ICC contract and the failure *552 of the project; he claims against Introcaso the same losses as are urged by Introcaso.
3. ICC claims against Lauricella for wrongful and malicious interference with the contract between ICC and 6818; it claims compensatory damages arising therefrom in the sum of $13,708.51, being the difference between the damages for the breach of that contract as found by the receiver and the sum received by it in the liquidation.
Both claimants also seek punitive damages, interest and costs and, in connection with the derivative claims on behalf of 6818, the award of counsel fees.

A. Findings of Fact

After taking title in March 1972, 6818 prepared plans and demolished the buildings then on the site. Lauricella arranged for construction and permanent financing through United Jersey Mortgage Company, which issued its $360,000 mortgage commitment on August 16, 1972; Lauricella and Introcaso accepted the commitment on behalf of 6818 on September 21, 1972. Introcaso, acting for ICC, solicited bids from and entered into oral agreements with subcontractors, and in late October 1972 commenced construction with excavation, placement of footings and foundations, and installation of sewer, water and electrical connections. The foundation was then backfilled and levelled in preparation for the pouring of the concrete slab.
To this point the only significant difficulty encountered was that, because of an error in the plans which ICC failed to note, certain anchor bolts had been wrongly placed. Although there was testimony from the plumbing subcontractor that this error necessitated breaking up and relocating footings, the greater weight of the evidence is that no on-site correction was required; rather, ICC instructed the structural steel subcontractor to revise in relatively minor ways the structural steel which had been fabricated and *553 was awaiting delivery to the job site. There was some dispute at trial as to when that instruction was given; I find that the instruction was given before December 19, 1972, but that the precise date is not material because the error delayed the completion of the structural steel by only one to two weeks at most, and in any event the job never progressed to the point that delivery of the steel to the job site was required.
Other minor disputes aired at trial as to the adequacy of the excavation or backfill are similarly without significance. In short, up to the time of the pour of the concrete slab on December 19, 1972 the construction had gone substantially according to its anticipated course; both Lauricella and Introcaso acknowledged that no difficulties or disputes had arisen between them to that time.
At the pour of the slab on December 19, 1972 ICC concededly deviated from the plan and specifications in at least two respects. It failed to cover the underlying ground with a polyurethane sheet, known as Visqueen, intended to prevent permeation of the slab by ground moisture; and it failed to use steel reinforcing rods in the slab. Although not claimed to be in violation of specific plan requirements, ICC concededly used sand rather than crushed stone as a base, and failed to provide expansion joints in the concrete. And, while the outside temperature on the day of the pour was disputed, I find, as contended by Lauricella and confirmed by the building inspectors present, that the ground was frozen to some degree.
Although Introcaso testified that Lauricella had authorized him to deviate from plans in order to economize during construction, that general authorization is not inconsistent with Lauricella's testimony that he was disturbed about the slab. The undisputed fact is that at the pour both the local and the state building inspectors advised Introcaso that Visqueen and reinforcing rods ought to be used; although they did not formally order work to stop, issuance of a certificate of occupancy could be imperiled by *554 failing to honor their recommendations. Introcaso acknowledged that in response he merely sought to assure the inspectors that ground and construction conditions made neither Visqueen nor reinforcing rods necessary. That undisputed testimony supports the further testimony of the state inspector that he called his office and was instructed to advise Introcaso that the State would accept the deviations from plans if the project engineer would certify that the slab met all performance requirements. No such certificate was ever obtained, and when the property was finally to be sold by the receiver the engineer indicated that certain corrective work would be required before a certificate would issue. That corrective work was relatively minor, however; it did not include removal of the slab but did include the cutting of expansion joints.
For these reasons I find that Lauricella was genuinely concerned about the performance of ICC in the pour. However, as already noted, the parties are foreclosed from relitigating the finding of the Chancery Division that 6818 breached its contract with ICC. The underpinning of that conclusion was the determination of the receiver, subsequently confirmed by the court, "that the work performed by ICC was done in a substantial, good and workmanlike manner." That essential finding is also binding here. See Mazzilli v. Accident & Cas. Ins. Co., 26 N.J. 307 (1958).
The principals offered widely divergent versions of the events which ensued between the December 19 pour and the March 17 meeting at which the corporate deadlock was formalized. Lauricella testified, in substance, that a variety of other problems arose, including complaints of neighbors, fence maintenance, snow removal, insurance premiums and the like; that he constantly inquired of Introcaso as to the resolution of these problems and the correction of the pour; that Introcaso's responses were vague and his actions ineffectual; that at all times he, Lauricella, urged Introcaso to continue with the project, but that Introcaso simply failed or refused to do so; that ultimately Introcaso said *555 that ICC was having difficulties on other jobs and that another contractor should be used, and that work thus came to a halt.
Introcaso acknowledged that Lauricella complained of the pour and such matters as insurance bills, snow removal and the like; but he testified, in substance, that Lauricella then said that he would not continue with the arrangement under which ICC was to supervise construction and that the project would proceed only if he and Introcaso jointly supervised construction without fee; that Introcaso rejected that proposal as being unfeasible and in violation of the original undertakings; that in response Lauricella said that if his demands were not met the project would never proceed, that he could afford to outwait Introcaso because he was a millionaire, that he would drag out the dispute so that Introcaso would never see his money and that he would never sell his interest to Introcaso; that Lauricella refused to arrange any construction mortgage drawdowns, and that he, Introcaso, proceeded toward corporate dissolution because Lauricella was thus preventing the completion of the project.
The record offers nothing in support of the Lauricella account, but rather corroborates that of Introcaso. The problems of which Lauricella concededly made much, both at their occurrence and at trial, were relatively unsubstantial and of a nature that must be anticipated in a project of this kind; certainly they cannot fairly be said to have represented serious threats to the success of the project or any material deviation by Introcaso or ICC from the obligations they had undertaken. The hypercritical approach taken by Lauricella thus tends to support Introcaso's testimony that it was Lauricella who refused to proceed.
Introcaso in fact had every reason to want 6818 and ICC to continue this cost-plus job. But although much work was done by ICC and substantial monies committed by 6818 up to the pour, Lauricella concededly never performed his obligation of arranging for the necessary drawdown of construction *556 mortgage monies, although Introcaso asked him to do so. Indeed, neither ICC nor any other 6818 creditor was paid at all until the receiver sold the real estate. Lauricella can hardly be said to have desired or permitted the survival of the project while thus failing to perform his own obligation to finance it. It is far more reasonable to believe that Introcaso sought the dissolution of the corporation, as he testified, because of Lauricella's refusal to proceed according to the original agreement.
In sum, I find that Lauricella alone was responsible for the cessation of the work and for the ultimate demise of the project; that Introcaso substantially performed all of his obligations as a principal of 6818 and ICC, and that he was at all times, ready, willing and able to continue with the project as originally agreed.[1] Although I also credit Introcaso's testimony as to Lauricella's threats, neither those words nor the acts they accompanied fairly evidence a malicious intention to do harm to Introcaso; they merely indicate Lauricella's fixed determination not to continue what he perceived to be a relationship no longer in his interest.

B. Conclusions of Law

1. Claims of Introcaso and Lauricella

As described above, Introcaso and Lauricella charge each other with having caused 6818 to fail, and each seeks to recover from the other his individual loss as a stockholder and, derivatively for 6818, the losses sustained by it.
Analysis of these claims by application of traditional corporate law principles is difficult and unsatisfying. Those principles derive from the view of the corporate entity *557 as separate and distinct from its shareholders, Jackson v. Hooper, 76 N.J. Eq. 592, 599 (E & A. 1910), whose business is conducted not by its principals but by elected directors, N.J.S.A. 14A:6-1, who have fiduciary obligations to the corporate entity and the stockholders, N.J.S.A. 14A:6-14; Hill Dredging Corp. v. Risley, 18 N.J. 501, 530-31 (1955). Accordingly under accepted rules of corporate law, a stockholder may recover derivatively on behalf of the corporation for losses sustained by the corporation caused by acts of directors in breach of their fiduciary obligations, Pomeroy v. Simon, 17 N.J. 59, 64 (1954), but may not recover derivatively if the losses result from directors' good faith business judgments N.J.S.A. 14A:6-14; Casson v. Bosman, 137 N.J. Eq. 532, 535 (E. & A. 1946); Mimnaugh v. Atlantic City Elec. Co., 7 N.J. Super. 310, 316 (Ch. 1950). The corollary is that a stockholder has no individual claim for loss in value of his investment resulting from acts of a director in breach of his fiduciary obligation Slutzker v. Rieber, 132 N.J. Eq. 412 (Ch. 1942).
That these concepts do not easily fit 6818 is apparent. This corporation was not separate and distinct from its principals in its operation, and even the formalities of the corporate form were largely disregarded. Its business was not managed by a board of directors, but by the two principals themselves; indeed the principals did not elect or even fix the number of directors. It would thus be vain to attempt to distinguish acts done as shareholders from those done as directors, or to distinguish a principal's duty to serve the corporation as director from his right to protect his personal interest as stockholder. 6818 was, in short, a classic "close corporation," which has been defined as "a corporation where management and ownership are substantially identical to the extent that the independent judgment of directors is, in fact, a fiction." Israels, The Sacred Cow of Corporate Existence: Problems of Deadlock and Dissolution, 19 U. Chi, L. Rev. 778 (1952); 1 O'Neal, Close Corporations § 1.02 (1971).
*558 The difficulties which unavoidably arise in attempting to apply corporate norms to the close corporation have led to the development of substantial authority permitting departure from these norms and recognition instead of the real relationships of the principals. New Jersey law has thus long accepted the view, as stated in Whitfield v. Kern, 122 N.J. Eq. 332 (E. & A. 1937), that
* * * the conception of a legal entity distinct from the persons composing the corporation is to be disregarded, in equity, in cases not within the reason and policy of this legal fiction, e.g., to adjust equities among members of the corporation internally where the rights of the public or third persons are in no wise involved. [at 347]
The principle thus stated has frequently been applied, though in varying terms. Some cases speak of the corporation as a statutory partnership  see, e.g., Fountain v. Fountain, 9 N.J. 558, 568 (1952); Breslin v. Fries-Breslin Co., 70 N.J.L. 274, 282 (E. & A. 1904); Sternberg v. Wolff, 56 N.J. Eq. 389, 394 (E. & A. 1898); others describe the corporation as a mere association of individuals, Rippel v. Kaplus, 124 N.J. Eq. 303, 304 (Ch. 1938); Newark Ladder, etc., Co. v. Furniture Workers &c., 125 N.J. Eq. 99, 102 (Ch. 1939); Perkins v. Trinity Realty Co., 69 N.J. Eq. 723, 731 (Ch. 1905); aff'd 71 N.J. Eq. 304 (E. & A. 1906); and still others talk in terms of the intent of the corporate principals, Fortugno v. Hudson Manure Co., 51 N.J. Super. 482, 500 (App. Div. 1958), or simply the propriety of piercing the corporate veil to avoid inequity, Schmid v. First Camden Nat'l. Bank Co., 130 N.J. Eq. 254, 261 (Ch. 1941). The New Jersey cases are consistent with developing law of other jurisdictions and all academic commentary. See, e.g., Conway, "The New York Fiduciary Concept in Incorporated Partnerships and Joint Ventures," 33 Fordham L. Rev. (1961); Hornstein, "Judicial Tolerance of the Incorporated Partnership," 18 Law and Contemporary Problems, 435 (1953); Hornstein, "Stockholders' Agreements in the Closely Held Corporation," 59 Yale L.J. 1040 (1950); *559 Israels, "The Sacred Cow of Corporate Existence: Problems of Deadlock and Dissolution," supra, 19 U. Chi. L. Rev. 778 (1952); O'Neal, "Close Corporation Legislation: A Survey and an Evaluation," 1972 Duke L.J. 867 (1972); Winer, "Proposing a New York `Close Corporation Law,'" 28 Cornell L.Q. 313 (1943); Comment, "Deadlock in a Close Corporation: A Suggestion for Protecting a Dissident, Co-Equal Shareholder," 1972 Duke L.J. 653; Note, "A Plea For Separate Statutory Treatment of the Close Corporation," 33 N.Y.U.L. Rev. 700 (1958).
The authorities also consistently recognize that, once corporate technisms are thus overcome, the relationship of the principals can be seen to be that of partners or coventurers.[2] As stated by Judge (now Chief Justice) Burger in Helms v. Duckworth, 101 U.S. App. D.C. 390, 249 F.2d 482 (D.C. Cir.1957):
In an intimate business venture such as this, stockholders of a close corporation occupy a position similar to that of joint adventurers and partners. While courts have sometimes declared stockholders "do not bear toward each other that same relation of trust and confidence which prevails in partnerships," this view ignores the practical realities of the organization and functioning of a small "two man" corporation organized to carry on a small business enterprise in which the stockholders, directors and managers are the same persons. A distinguishing characteristic of such a corporation is the absence of a division between the stockholders-owners and the director-managers, for the former either personally manage and direct the business or so dominate the directors as to render the latter agents. [at 486-487]
See also, Arditi v. Dubitzsky, 354 F.2d 483, 486-87 (2 Cir.1965); Kruger v. Gerth, 16 N.Y.2d 802, 263 N.Y.S.2d 1, 210 N.E.2d 355 (Ct. App. 1965) (dissent); Hornstein, supra, at 1040; Israels, supra, at 778; Comment, supra, at 653; and Note, supra, at 700.
*560 Denominating the principals as partners or coventurers not only provides an accurate functional description but also appropriately recognizes the mutual rights and obligations which should characterize their relationship. The propriety of thus applying partnership or joint venture principles to members of the close corporation was well stated by Chief Justice Tauro in Donahue v. Rodd Electrotype Co. of New England, Inc., ___ Mass. ___, 328 N.E.2d 505 (1975):
Because of the fundamental resemblance of the close corporation to the partnership, the trust and confidence which are essential to this scale and manner of enterprise, and the inherent danger to minority interests in the close corporation, we hold that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another. In our previous decisions, we have defined the standard of duty owed by partners to one another as the "utmost good faith and loyalty." Cardullo v. Landau, 329 Mass. 5, 8, 105 N.E.2d 843 (1952); DeCotis v. D'Antona, 350 Mass. 165, 168, 214 N.E.2d 21 (1966). Stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation. [328 N.E.2d at 515]
In Sternberg v. Wolff, supra 56 N.J. Eq. at 394, our Court of Errors and Appeals early suggested the same view:
Corporations such as the one now before us are mere trading companies, with a corporate organization for the convenience of conducting the business for which they were incorporated. Such a corporation has not the qualities of corporations created for public purposes. No reason appears why, in the matter of the control and conduct of its business, the corporation and its officers should not be within the control of the court of chancery to an extent corresponding with the control of that court over the business of a mere partnership.
See also, Jolin v. Oster, 55 Wis.2d 199, 198 N.W.2d 639, 647-48 (Sup. Ct. 1972); McDonald v. McDonald, 53 Wis.2d 371, 192 N.W.2d 903, 908-10 (Sup. Ct. 1972); Tilley v. Shippee, 12 Ill.2d, 616, 147 N.E.2d 347, 352 (Sup. Ct. 1958); Green v. National Advertising & Amusement Co., *561 137 Minn. 65, 162 N.W. 1056, 1058 (Sup. Ct. 1917); Winer, supra at 321; Conway supra, at 306; O'Neal, supra, 1972 Duke L.J. at 892.
Under partnership principles[3] Lauricella must be said to have acted wrongfully in refusing to abide by his original undertakings. Although in the absence of some contrary showing a partnership is deemed to be at will and any partner may withdraw at any time without incurring liability N.J.S.A. 42:1-31(1)(b); Sarner v. Sarner, 62 N.J. Super. 41, 55 (App. Div. 1960), aff'd 38 N.J. 463 (1962); Karrick v. Hannaman, 168 U.S. 328, 335, 18 S.Ct. 135, 42 L.Ed. 484 (1897), such a withdrawal is wrongful if it is in violation of an express or implied agreement that the relationship would continue for a definite term or until a particular undertaking is completed N.J.S.A. 42:1-31; Karrick v. Hannaman, supra; Crane and Bromberg on Partnership, § 75 at 426-30 (1968).
Whether the relationship is at will or for a fixed term or until the accomplishment of a particular undertaking is a question of fact, Crane and Bromberg, supra, § 74 at 423; Sarner v. Sarner, supra; Ruta v. Werner, 1 N.J. Super. 455, 459 (Ch. Div. 1948). Here the nature of the project was such that substantial investments of money, time and energy would be required from which no return would be forthcoming unless and until the building was completed. The only commonsense view is, as testified by Introcaso, that the principals intended their relationship not to be one from which either could withdraw at will before completion of the project, but one rather to which each committed himself until the building was completed. The inferences arising *562 in such circumstances were succinctly stated in Hardin v. Robinson, 178 App. Div. 724, 162 N.Y.S. 531 (App. Div. 1916), aff'd 223 N.Y. 651, 119 N.E. 1047 (Ct. App. 1918):
It is true that where a partnership is not limited as to time, and there is nothing to show the intention of the parties as to its duration, it will be held to be a partnership at will. But where a partnership has for its object the completion of a specified piece of work, or the effecting of a specified result, it will be presumed that the parties intended the relation to continue until the object has been accomplished. There is, then, a term fixed by the copartnership agreement, and until that time arrives one partner cannot terminate the partnership and continue the enterprise for his own benefit. [162 N.Y.S. at 534-535]
In keeping with this analysis, a number of cases have found agreements to develop real estate to be partnership or joint venture obligations which are to continue until the undertaking is accomplished. See, e.g., Zimmerman v. Harding, 227 U.S. 489, 33 S.Ct. 387, 57 L.Ed. 608 (1913); Williams v. Terebinski, 52 Ohio Op.2d 114, 261 N.E.2d 920 (C.P. 1970); Pemberton v. Ladue Realty & Const. Co., 237 Mo. App. 971, 180 S.W.2d 766 (Ct. App. 1944); Hardin v. Robinson, supra; cf. Turtur v. Isserman, 2 N.J. Misc. 1084 (Ch. 1924); Drummond v. Batson, 162 Ark. 407, 258 S.W. 616 (Sup. Ct. 1924); Tankersley v. Norton, 142 Ark. 339, 218 S.W. 660 (Sup. Ct. 1920).
It is of no moment that the premature dissolution of 6818 was ordered on Introcaso's application to the Chancery Division and over Lauricella's objection That relief, available to Introcaso as a stockholder by statute, N.J.S.A. 14A:12-7, and common law, Stark v. Reingold, 18 N.J. 251, 265-266 (1955), was essentially comparable to the remedy available to a partner where the actions of a copartner prejudicially affect the carrying on of the business or make it not reasonably practical to carry on the business with him. N.J.S.A. 42:1-32; Stark v. Reingold, supra at 263. See also Annotation "Misconduct of or dissensions among partners or joint adventurers as ground *563 for dissolution by court," 118 A.L.R. 1421 (1939). Although Introcaso took the initiative, it was Lauricella whose acts precipitated that move. Lauricella's refusal to abide by his original agreement was not justified by any fault of Introcaso or any breach by him of his correlative obligations  cf. Stark v. Reingold, supra; Turtur v. Isserman, supra; Kurtzon v. Kurtzon, 339 Ill. App. 431, 90 N.E.2d 245 (Ct. App. 1950); nor was it justified by the alleged breach of contract by ICC, which issue was decided adversely to Lauricella by the Chancery Division; nor can it be justified by any suggestion that the project was impracticable or not reasonably likely to succeed  cf. Sieghortner v. Weissenborn, 20 N.J. Eq. 172 (Ch.), mod. 21 N.J. Eq. 483 (E. & A. 1869); Warwick v. Stockton, 55 N.J. Eq. 61 (Ch. 1896)). Having wrongfully caused the termination of the relationship in violation of the agreement, Lauricella is thus liable for the resulting losses to Introcaso. See N.J.S.A. 42:1-38, subd. 2(a); Zeibak v. Nasser, 12 Cal.2d 1, 82 P. 2d 375 (D. Ct. App. 1938); Crane and Bromberg, supra, § 75(d), fn. 87; A.J. Richey Corp. v. Garvey, 132 Fla. 602, 182 So. 216 (Sup. Ct. 1938). See generally, Annotation "Actions at Law between partners and partnerships," 21 A.L.R. 21 (1922) supplemented 58 A.L.R. 621 (1929) supplemented 168 A.L.R. 1088 (1947).
As to damages, Introcaso made no offer to prove any loss of anticipated profits, but rather claims his loss should be measured by the wasted expenditures of 6818 in preparation and part performance of the undertaking. See Holt v. United Security Life Ins. Co., 76 N.J.L. 585 (E. & A. 1909); Restatement, Contracts, § 333 (1932); 11 Williston on Contracts (3d ed. 1968), § 1363A; 5 Corbin on Contracts, § 1031 (1964). All of the 6818 expenditures were made by the receiver as reported in his final account approved in the Chancery Division proceeding; the question presented here is how the burden of those expenditures should be allocated between the principals.
*564 The property was purchased at $70,000, of which essentially $35,000 was paid by each of the principals, and was ultimately sold by the receiver on April 3, 1975 for $110,000. As shown in the receiver's report, $41,599.85 had been expended in on-site work ($33,256.95 by ICC, $6,000 by the plumbing subcontractor and $2,342.90 by Lauricella as the electrical subcontractor). Clearly, any expenditures which enhanced the value cannot be considered as losses sustained by 6818. Although it may be inferred that the value of the land was not enhanced to the full extent of the cost of the work done, the record offers no basis for determining how much of the $40,000 difference between the purchase and sales prices can be attributed to the work done as against inflation or other such causes; in the absence of such showing, it is appropriate to conclude that $40,000 of the $41,599.85 expended in on-site work was recaptured upon the sale by the receiver, and only $1,599.85 was a loss attributable to Lauricella. See Brenneman v. Auto-Teria, Inc., 260 Or. 513, 491 P.2d 992 (Sup. Ct. 1971); 11 Williston on Contracts, (3d ed. 1968), § 1363A.
A second group of obligations allowed to ICC in the receivership, totalling $43,267, clearly yielded no benefit to the corporation: $33,104 awarded to ICC for lost future profits on the uncompleted balance of the job, and $10,163 for structural steel fabricated but never used. Those costs are properly regarded as losses caused by Lauricella. See Holt v. United Security Life Ins. Co., supra.
A third group of expenses paid by the receiver, totalling $10,515.44, includes a variety of items not directly related to construction: real estate taxes and interest ($6,805.09); legal fees and expenses for the incorporation ($2,550.35); architect fees ($1070), and surveyors fee ($90). Under the circumstances presented such expenditures made in preparation for and in support of the project are also appropriately considered as losses which arise upon the aborting of the project. See Restatement, Contracts, § 333 (1932); Lefkowitz v. Cohn, 126 N.J.L. 377 (Sup. Ct. 1941); Feldman v. Jacob Branfman *565 & Son, Inc., 111 N.J.L. 37 (E. & A. 1933); National Sand & Co. v. R.H. Beaumont Co., 9 N.J. Misc. 1026, 156 A. 441 (Sup. Ct. 1931); Annotation, "Right to recover, in action for breach of contract, expenditures incurred in preparation for performance, 17 A.L.R.2d 1300 (1951).
The remaining expenses incurred by 6818, totalling $25,899.43, all arise out of the receivership proceeding: the receiver's allowance ($15,000); his expenses and disbursements, including transcripts of extensive hearings on claims ($4,299.43), and the broker's commission on the sale of the real estate ($6,6000). Whether such costs should be awarded to the prevailing party was discussed in Cusano v. Cusano, 19 N.J. Super. 255 (App. Div.), certif. den. 10 N.J. 310 (1952), where a partner who successfully defended against a dissolution application appealed the action of the trial court in charging the custodial receiver's allowance against the partnership. In affirming the trial court, Judge (later Justice) Francis said that although "[a] completely wrongful and unjustified receivership action undoubtedly would provide a basis for assessment of costs against the instigators rather than the victim of the litigation", yet
In any event, dismissal of receivership proceedings, of itself, would not require or justify assessment of allowances against the persons who initiated the action. If any reasonable grounds for the belief by the plaintiffs that such action was justified are shown by the record, then assessment of incidental costs may be made properly against the business, even though the belief, when subjected to the impact of all the facts and circumstances, turned out to be erroneous. In appraising the reasonableness of the belief, consideration must be given to the persons involved, their business capacity and the situation in which they found themselves at the time when they acted. [19 N.J. Super. at 272]
Cf. Greenbaum v. Lafayette & Broad Realty Corp., 97 N.J. Eq. 536 (E. & A. 1925).
Although the factual setting is different here, like considerations are applicable. The 6818 receivership resulted from acts of Lauricella which have been found to be without justification; but although Lauricella's judgment was erroneous, *566 it cannot be said that his concern about the performance by ICC and Introcaso or for the future of the project was without some reasonable grounds. Consonant with Cusano and the general principle that every litigant should bear his own expenses (see Grober v. Kahn, 47 N.J. 135 (1966)), the costs of the receivership are not to be considered as damages or otherwise visited solely upon Lauricella.
Accordingly, the total dollar amount of the losses to 6818 which can be said to flow from Lauricella's breach is $55,382.29: however, the claims (other than the real estate taxes and interest) were satisfied only to the extent of 84.51 cents on the dollar, and the actual loss must be considered as being only $47,857.68; Introcaso as a 50% stockholder sustained half that loss and thus is entitled to be reimbursed $23,928.84. Cf. Atkinson v. Marquart, 112 Ariz. 304, 541 P.2d 556 (Sup. Ct. 1975); Elsbach v. Mulligan, 58 Cal. App.2d 354, 136 P.2d 651 (D. Ct. App. 1943). See also, McCartin v. Traphagen, 43 N.J. Eq. 323, 335 (Ch. 1887), aff'd sub nom. McCartin v. McCartin, 45 N.J. Eq. 265 (E. & A. 1889).
The alternate theory of damages advanced by Introcaso, i.e., that he is entitled to be recompensed the full amount of his capital investment, is unsupported by authority and unsound: the losses which can be traced to the breach simply do not match the original investment. It is appropriate to note, however, that the damages allowed, together with Introcaso's proportionate share of the disallowed receivership expenses, approximate Introcaso's capital contribution.
In view of the finding that Lauricella did not act maliciously, the demand for punitive damages must be denied. See Security Corp. v. Lehman Associates, Inc., 108 N.J. Super. 137 (App. Div. 1970). And, inasmuch as the real nature of the case has been found to be a dispute between the two principals rather than a derivative action on behalf of the corporate entity, the application for counsel fees must also be denied. See Grober v. Kahn, supra; Sarner v. Sarner, 38 N.J. 463 (1962).
*567 The demand for interest is denied as well. See Jardine Estates v. Donna Brook Corp., 42 N.J. Super. 332 (App. Div. 1956). The claims of Lauricella are dismissed with prejudice.

2. Claim of ICC

ICC seeks judgment against Lauricella in the sum of $13,708.51, representing the difference between its $88,494.41 breach of contract claim found by the Chancery Division and the $74,785.90 which it collected from the receiver. The claim was based on the allegation that Lauricella maliciously caused 6818 to breach the contract; in view of the factual finding that Lauricella did not act maliciously, that theory of recovery must fail.
Nor would it be otherwise appropriate to ignore the corporate entities in this phase of the case. In this aspect of their dealings Lauricella and Introcaso undertook to arrange a contract between their two corporate entities; in so doing, they accepted the benefits and assumed the burdens of the limitation on their respective personal liabilities. Nothing has been shown to warrant disregarding the corporate form to permit further recovery by ICC. The claim of ICC is therefore dismissed with prejudice. Cf. White v. Evans, 117 N.J. Eq. 1 (E. & A. 1934).

II. 138-142 68th Street

[The court here resolved claims among Lauricella, Introcaso, ICC and 68th Street Apartments, Inc., a New Jersey corporation wholly owned by Introcaso, arising out of a separate building project at 138-142 68th Street, Guttenberg, New Jersey.]
NOTES
[1] The receiver similarly concluded that "the failure of the project to go forward was not the fault of Mr. Introcaso" and that "the project failed to proceed to completion because of the fault of Mr. Lauricella"; those collateral findings were previously determined not to be controlling in this proceeding. See Mazzilli v. Accident & Cas. Ins. Co., supra.
[2] The rules of law which apply to partners apply also to joint venturers. See Jackson v. Hooper, 76 N.J. Eq. 185, 198 (Ch. 1909), rev'd on other grounds, 76 N.J. Eq. 592; Wittner v. Metzger, 72 N.J. Super. 438 (App. Div.), certif. den. 37 N.J. 228 (1962).
[3] The partnership or joint venture theory was not advanced in the pleadings or pretrial order; it was fully aired at trial, however, and in post-trial briefs and is therefore properly resorted to in determining the issues. R. 4:9-2; Fluoro Electric Corp. v. Smith Transport Ltd., 58 N.J. Super. 287, 294 (App. Div. 1959) aff'd 32 N.J. 277 (1960).