281 N.J. Super. 22 (1995)
656 A.2d 448
WANAQUE BOROUGH SEWERAGE AUTHORITY, PLAINTIFF,
v.
TOWNSHIP OF WEST MILFORD AND BOROUGH OF RINGWOOD, DEFENDANTS-CROSS-RESPONDENTS, AND BOROUGH OF WANAQUE, DEFENDANT, AND RINGWOOD BOROUGH SEWERAGE AUTHORITY, DEFENDANT-APPELLANT, AND WANAQUE VALLEY REGIONAL SEWERAGE AUTHORITY, DEFENDANT-THIRD PARTY PLAINTIFF-RESPONDENT-CROSS-APPELLANT,
v.
WEST MILFORD MUNICIPAL UTILITIES AUTHORITY, THIRD PARTY DEFENDANT-CROSS-RESPONDENT, AND EUGENE RICHARDS; JOHN B. GREENE; JACOB MAAS; GENE OSIAS; AND STATE OF NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THIRD PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 24, 1995.
Decided April 13, 1995.
*26 Before Judges PRESSLER, LANDAU and NEWMAN.
Darlene J. Pereksta argued the cause for cross-appellant Wanaque Valley Regional Sewerage Authority (Williams, Caliri, Miller & Otley, attorneys; Ms. Pereksta, on the brief).
Martin F. Murphy argued the cause for cross-respondent Township of West Milford (Johnson, Murphy, Hubner, McKeon and Wubbenhorst, attorneys; Mr. Murphy and Robert H. Oostdyk, Jr., on the brief).
Robert Baum argued the cause for cross-respondent West Milford Municipal Utilities Authority (Hein, Smith, Berezin, Maloof, Spinella & Rogers, attorneys; Mr. Baum, on the brief).
The opinion of the court was delivered by LANDAU, J.A.D.
This matter reaches us on the cross-appeal by the Wanaque Valley Regional Sewerage Authority (WVRSA) from an order dismissing its cross-claims and third-party complaint against several municipalities and their sewerage authorities in a Law Division action commenced by the Wanaque Borough Sewerage Authority (WBSA) to compel payment to WVRSA of proportionate shares of costs incurred in planning and designing an aborted regional sewerage facility initially intended to serve areas of the three municipalities.
At the conclusion of plaintiff's proofs in the Law Division nonjury trial, motions to dismiss were granted in favor of defendants Township of West Milford (West Milford), the West Milford Municipal Utilities Authority (WMMUA), and the Borough of Ringwood (Ringwood). Judgment against the Ringwood Borough Sewerage Authority (RBSA) was entered for $894,850.12 representing its share of the planning and design costs for a regional facility. An appeal by RBSA was dismissed for lack of prosecution. WVRSA's claim against the Borough of Ringwood has since been resolved amicably. Thus, this appeal involves only the *27 dismissed claims of WVRSA against West Milford and WMMUA, made in its cross-claim and third-party complaint. We reverse.
In its cross-claim and third-party complaint, WVRSA alleged that in 1966 the Wanaque Valley Regional Sewerage Study Committee (Study Committee) was formed by, among others, the adjacent municipalities of Wanaque, Ringwood and West Milford to study and evaluate the problems of sewage disposal in the Passaic River basin. Wanaque, Ringwood and WMMUA were members of the Study Committee. In 1969 the Study Committee was authorized to obtain $457,000 in loans from the New Jersey Department of Health to finance preliminary planning and design work for a proposed regional sewage system. In 1971 WVRSA was created by the joint action of Wanaque, Ringwood and West Milford to design and construct a regional sewage transmission and treatment system. WVRSA claimed that its creation was "premised on the understanding that Wanaque, Ringwood and a portion of West Milford would be physically serviced by the WVRSA."
In May 1971 the Study Committee assigned all its rights to WVRSA in exchange for WVRSA's agreement to repay the loans which the Study Committee had received. WVRSA claimed that its agreement to repay these loans, "which Ringwood, Wanaque, and WMMUA were obligated to pay," was "premised on the representation, promise, and/or implied promise of Ringwood, RBSA, and WMMUA that areas within Ringwood and West Milford would tie into and support the [proposed] regional system", which they later declined to do.
Because WVRSA had used the loan funds for "studies, designs and projections in the three municipalities [Wanaque, Ringwood and West Milford]," WVRSA claimed that Ringwood, West Milford and WMMUA had "benefitted from the studies, designs and projections funded by the loans without paying for same and have been unjustly enriched thereby." WVRSA demanded a judgment against them for their proportionate share of the loans.
*28 WVRSA also alleged that in October 1976 WMMUA refused to sign a service agreement with WVRSA to participate in its proposed regional sewage system, and "[a]s a result, the planning of the whole project, including projected capacities had to be revised at additional cost to WVRSA and much of the planning, design and studies became valueless to WVRSA." While WVRSA acknowledged that West Milford, and "its agency" (WMMUA), had the "right to drop out" of WVRSA's proposed regional sewage system, WVRSA asserted that "West Milford and WMMUA benefitted from ... [WVRSA's] design, planning and projections and were thereby unjustly enriched." Therefore, WVRSA demanded that they pay it "their pro rata share of the cost of planning and designing attributable to the inclusion of West Milford in the project as well as a pro rata share of redesign costs occasioned by the refusal of WMMUA to enter into a Service Agreement."
As noted above, the trial judge had dismissed all claims save for that against RBSA. Judgment on that claim was granted because of RBSA's breach of a written service agreement entered into among WVRSA, WBSA and RBSA. RBSA was held liable "for its fair share of all costs incurred up to the date of its withdrawal from the WVRSA."
Dismissal of the fair share claims which did not rest upon breach of a written contract was granted because the trial judge rejected plaintiff's "one theory" of implied contract. He ruled that a municipality can be so bound only where it is shown that it "has the particular power to act and that it does enter into a contract which is for some reason found to be void but nevertheless the other contracting party having acted and extended itself in good faith is entitled to payment...." The judge went on to find no "evidence of such a [fact] situation ... and therefore no basis for implied contract liability against any of the defendants." He also concluded that under the clear terms of the May 1971 resolution of WVRSA, it agreed to repay all loans received by the Study Committee, notwithstanding that defendants all participated in the *29 formation of the joint venture Study Committee and together had created WVRSA in anticipation of a regional sewage system.
In reliance upon Graziano v. Mayor and Tp. Comm. of Montville Tp., 162 N.J. Super. 552, 394 A.2d 103 (App.Div.) certif. denied, 79 N.J. 462, 401 A.2d 219 (1978), and N.J.S.A. 40:14B-49, it was held that no authority exists to impose liability on West Milford, WMMUA, or Ringwood because the only written contract in existence was the Service Agreement among WVRSA, RBSA, and WBSA. We must differ with this analysis.
It is clearly inferable from the proofs that at the time WVRSA agreed to be responsible for debts of the Joint Venture, the parties continued to believe that some form of regional sewage program would be implemented. As a matter of law, it cannot be said that the withdrawing municipalities did not receive substantial benefits from exploration of the regional approach. The benefits may have been limited to receipt of cost and other important data which prompted the decisions not to go forward, but such benefits are no less tangible than if they resulted in a decision to pursue the regional program. From the standpoint of WBSA and WVRSA, it surely would not have been necessary to undertake the cost of regional technical studies, or the later costs of preparing downsizing revisions, had it not been understood that all parties were benefitting both from the joint study undertaking and from the creation of WVRSA to explore and implement a regional sewage disposal scheme in the Wanaque Valley.
The rendition of services to another under circumstances which negate the idea that they were gratuitous, creates an obligation (implied from the circumstances) to pay what the services are reasonably worth; this is a contract implied in fact. Shapiro v. Solomon, 42 N.J. Super. 377, 383, 126 A.2d 654 (App. Div. 1956). An implied-in-fact contract is, in legal effect, an express contract, in the sense that the parties' agreement is inferred by law, as a matter of reason and justice, from their conduct, or from the circumstances surrounding their relationship. St. Paul Fire & Marine Ins. Co. v. Indemnity Ins. Co. of North America, *30 32 N.J. 17, 22-25, 158 A.2d 825 (1960). For example, a promise to pay for services rendered by plaintiff can be inferred from the parties' conduct and relationship if, when objectively viewed, they reveal that defendant should have realized that plaintiff would expect reimbursement for those services. Id. at 24-25, 158 A.2d 825. In other words, a defendant is obligated to pay for services rendered for it by plaintiff, if the circumstances are such that plaintiff reasonably expected defendant to compensate it, and if a reasonable person in defendant's position would know that plaintiff was performing the services in confidence that defendant would pay for them. Avery v. Sielcken-Schwarz, 5 N.J. Super. 195, 200, 68 A.2d 635 (App.Div. 1949). Accord Insulation Contracting & Supply v. Kravco, Inc., 209 N.J. Super. 367, 377-78, 507 A.2d 754 (App.Div. 1986).
Of course, where the general power to contract on the subject does not exist, no recovery against a municipal corporation may be had on the theory of implied contract. Hudson City Contracting Co. v. Jersey City, Incinerator Auth., 17 N.J. 297, 309, 111 A.2d 385 (1955). For example, when the Legislature "expressly prohibits the incurring of liability on contract or otherwise" by the municipal corporation, "no recovery may be had either on express or implied contract." Ibid.
However, "where the power to contract lies within the competence of the municipal corporation," but it failed, for example, to follow the statutorily mandated "mode of contracting," recovery may be allowed under an "implied contract theory" where the municipal corporation received a benefit from the rendered services, to the extent of the "reasonable value of the services rendered." Id. at 306-09, 111 A.2d 385. See also 405 Monroe Co. v. Asbury Park, 40 N.J. 457, 463, 193 A.2d 115 (1963) (where the power of the municipality to contract has not been expressly barred by the Legislature, relief may be granted to one who has dealt with the municipality in good faith, to the extent of the "benefit conferred upon and knowingly accepted by the municipality"). *31 We think this principle to be particularly apt where all parties involved are municipal corporations and agencies.
WVRSA notes that the judge himself recognized that N.J.S.A. 40:14B-49 "specifically provides for and authorizes contracts between sewerage authorities and MUA's on the one hand and municipalities on the other for the payment by municipalities to the sewerage authority or the MUA for support of the expenses of a sewerage authority or an MUA." See N.J.S.A. 40:14B-49 (MUA and municipality "may enter into a contract or contracts providing for or relating to the collection, treatment and disposal of sewage or solid waste originating in the district or received by the [MUA], ... and the cost and expense of such collection, treatment and disposal"). See also Browning-Ferris v. City of Passaic, 116 N.J. 83, 88-90, 560 A.2d 1208 (1989); Graziano v. Mayor & Tp. Comm. of Montville Tp., 162 N.J. Super. 552, 561, 394 A.2d 103 (App.Div.), certif. denied, 79 N.J. 462, 401 A.2d 219 (1978). West Milford, citing to N.J.S.A. 40:14B-49, acknowledges that "specific statutory authority clearly exists for a municipality to enter into an agreement to accept responsibility for the obligations of a sewerage authority," and concedes that it is "certainly possible for municipalities serviced by a sewerage authority to obligate themselves for the debts of the sewerage authority."
The West Milford entities say that WVRSA presented "absolutely no evidence" that West Milford had received "any benefit" from the expenditures for the studies made by WVRSA. While West Milford does not dispute that WVRSA made expenditures for engineering and environmental studies "for the purpose of planning for regional sewerage treatment facilities," it claims such studies could be of benefit to West Milford "only if the Township utilized the results of the studies by either utilizing the facilities of ... [WVRSA], or by constructing its own facilities at the time the studies were performed." "Without evidence of any benefit received by the Township of West Milford," it claims there is no basis for recovery under a "theory of unjust enrichment."
*32 In response to West Milford's allegation that "evidence of neither unjust enrichment nor implied contract was presented," WVRSA notes that West Milford does not deny that there was evidence "to the effect that WVRSA performed, with West Milford's knowledge, studies of West Milford's water supply, zoning requirements and population projections, which studies preceded West Milford's decision not to enter into a service agreement with WVRSA," and that it does not deny that "West Milford utilized such studies in arriving at its decision regarding its town's sewage treatment needs and whether or not it wished to enter into a service agreement for sewage treatment with WVRSA". Because evidence was presented by which one could find that West Milford and its utility authority received a benefit  information critical to decision making  from WVRSA's studies, the judge erred in granting the West Milford and WMMUA motions to dismiss at the close of WVRSA's case.
Under R. 4:37-2(b), the motion by West Milford and WMMUA to dismiss at the conclusion of plaintiff's case should have been denied because, accepting as true all the evidence supporting WVRSA's implied contract claim and according WVRSA the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ. See Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969).
While the foregoing provides sufficient reason for reversal as to West Milford and WMMUA, we note that there is also merit in WVRSA's argument that the trial judge failed to rule on or consider its argument that WVRSA itself was essentially a "joint venture of the municipalities which formed it." An agreement establishing a joint venture may be express, or it may be implied in whole or in part from the conduct of the parties. Cooperstein v. Shapiro, 122 N.J. Eq. 238, 241, 192 A. 826 (E. & A. 1937). To constitute a joint venture, there must merely be an agreement to enter into an undertaking in which the parties have a "community of interest and a common purpose in its performance." Upper Penns Neck Tp. v. Lower Penns Neck Tp., 20 *33 N.J. Super. 280, 288, 89 A.2d 727 (Law Div. 1952). Where there is no specified time limitation for the continuance of the joint enterprise, it may be terminated by the will of any of the joint venturers. Ibid.
However, when a joint venturer has "wrongfully caused the termination of the relationship" prior to accomplishment of the joint undertaking, the terminating joint venturer may be held liable for "resulting losses," and for "wasted expenditures ... in preparation and past performance of the undertaking." 68th St. Apts., Inc. v. Lauricella, 142 N.J. Super. 546, 562-64, 362 A.2d 78 (Law Div. 1976), aff'd o.b., 150 N.J. Super. 47, 374 A.2d 1222 (App.Div. 1977). See also Turtur v. Isserman, 2 N.J. Misc. 1084, 1087, 128 A. 151 (Ch. 1924) (where joint venturer wrongfully refused to complete his agreed contributions to the joint enterprise, the remaining joint venturers could charge his share of the joint venture with the "additional expense and damage caused by his default"). A withdrawal from the joint undertaking is wrongful "if it is in violation of an express or implied agreement that the relationship would continue for a definite term or until a particular undertaking is completed." 68th St. Apts., Inc., supra, 142 N.J. Super. at 561, 362 A.2d 78.
There was sufficient evidence to require the trier of fact to have considered and ruled upon this theory of recovery as well as that of implied contract.
Accordingly, upon the remand which we order, resulting losses or wasted expenditures, if any, not otherwise comprehended within the implied contract claim, but determined to result from wrongful termination by a joint venturer, shall also be considered.
The reversal and remand for trial on implied contract and joint venture theories makes it unnecessary for us to consider WVRSA's challenge to the validity (as applicable to WMMUA) of its agreement to assume all debts of the Study Committee. As we see it, the assumption agreement may have been valid, but this rendered the parties no less subject to such obligations as may be *34 determined to exist under the implied contract or joint venture theories.
The judgment of September 2, 1992, is reversed to the extent it dismissed the claim of WVRSA against West Milford and WMMUA, and those issues are remanded for trial consistent with this opinion.